17-911-cv
*Brandon v. Kinter*

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term 2018

(Argued: April 9, 2019            Decided: September 10, 2019)

Docket No. 17-911-cv

---

CHAMMA K. BRANDON,

*Plaintiff-Appellant*,

– v. –

SUZANNE KINTER, LAWRENCE BEDARD, ROBERT WEBB, JOSHUA WINGLER, THOMAS PERRY, ERIC BLAISE, KEVIN LAURIN, MARGARET CLANCY,

*Defendants-Appellees*,

GLENN SCHROYER, JIM ALGER, CLINTON COUNTY JAIL,

*Defendants*.[1]

---

Before: WALKER, CALABRESI, and CHIN, *Circuit Judges*.

---

[1] The Clerk of Court is respectfully directed to amend the official caption as listed above.

Appeal from the judgment of the United States District Court for the Northern District of New York (McAvoy, J.) granting Defendants' motion for summary judgment. Plaintiff was a Muslim prisoner at the Clinton County Jail (CCJ). He sued Defendant CCJ and several of its employees for denial of his right to free exercise of religion in violation of the First Amendment, for deliberate indifference to his medical needs in violation of the Eighth Amendment, for violation of the Religious Land Use and Institutionalized Persons Act, and for conspiring with each other to take the above mentioned actions. Plaintiff alleged, *inter alia*, that Defendants (1) routinely served him meals that did not comply with his religious diet, and (2) retaliated against him for filing meal-related grievances. The district court granted summary judgment to Defendants on all of Plaintiff's claims.

Plaintiff now appeals his First Amendment free exercise claim and his First Amendment retaliation claim against Defendants CCJ employees Suzanne Kinter, Lawrence Bedard, Robert Webb, Joshua Wingler, Thomas Perry, Eric Blaise, Kevin Laurin, and Margaret Clancy. The other claims and defendants are not before us on this appeal.

We hold that Plaintiff introduced sufficient evidence to create a genuine dispute of material fact as to both of the appealed claims. But we permit Plaintiff to proceed on his claims against only those Defendants who were personally involved in each violation.

As to Plaintiff's free exercise claim, we, therefore, VACATE the district court's decision and REMAND for Plaintiff to proceed against Defendants Kinter, Bedard, Laurin, Clancy, Perry, and Webb. And we AFFIRM the district court's decision granting summary judgment on this claim to Defendants Blaise and Wingler.

As to Plaintiff's retaliation claim, we VACATE the district court's decision and REMAND for Plaintiff to proceed against Defendants Kinter, Bedard, Laurin, Clancy, and Blaise. And we AFFIRM the district court's decision granting summary judgment on this claim to Defendants Webb, Wingler, and Perry.

---

Sarah E. Hsu Wilbur, Thomas A. Zelante, Jr., and Jon Romburg, Seton Hall University School of Law, Newark, NJ, *for Plaintiff-Appellant*.

Gregg T. Johnson, Lemire, Johnson & Higgins, Malta, NY, *for Defendants-Appellees*.

GUIDO CALABRESI, *Circuit Judge*:

Chamma Brandon, a Muslim inmate at the Clinton County Jail (CCJ), sued CCJ and several of its employees under 42 U.S.C. § 1983. Brandon claimed, *inter alia*, that the defendants denied his right to the free exercise of religion under the First Amendment by routinely serving him meals containing pork in violation of his Muslim diet, and that they retaliated against him for filing meal-related grievances. The district court granted summary judgment to the defendants on all counts. In relevant part, the district court held that the evidence showed only that Brandon was served 10 noncompliant meals, which the court held was not a substantial burden on his religious beliefs.[2]

We vacate in part and affirm in part the district court's decision. First, as to Brandon's free exercise claim, we hold that there is sufficient evidence to create a genuine dispute of material fact about the number of noncompliant meals Brandon received. A reasonable jury could find that Brandon was served significantly more

---

[2] The district court also held that Brandon had not exhausted his retaliation claim. On appeal, the defendants have abandoned their exhaustion argument.

3

than 10 meals containing pork. While that, in itself, would be sufficient to justify reversal, we further hold that the district court also erred in concluding that 10 noncompliant meals was not a substantial burden.

Second, as to Brandon's retaliation claim, the defendants argue that no reasonable jury could find that they retaliated against Brandon. We hold that a genuine dispute exists as to facts underlying the alleged retaliation, and we therefore vacate the district court's dismissal of that claim.

Because liability under § 1983 requires personal involvement, we, however, vacate and remand for Brandon to proceed against only those defendants who were personally involved in the violations. And we affirm the dismissal of the claims against those defendants as to whom there is no evidence of personal involvement.

## BACKGROUND

Brandon was incarcerated at CCJ on January 14, 2012. He avers that he declared upon intake that he was a Muslim, but CCJ records do not contain any declaration of religious status on that date. On March 2, 2012, Brandon was released, re-arrested, and returned to CCJ—all on the same day. There is no

dispute that, upon re-arrest, Brandon declared that he was a Muslim and that he did not eat pork. Brandon remained at CCJ until December 25, 2012.

The defendants-appellees[3] were all CCJ employees at the time of the events in this case. Suzanne Kinter, the Jail Healthcare Coordinator, supervised CCJ nurses and oversaw inmate medical treatment. Lawrence Bedard, the Food Service Manager, supervised the cooks in the CCJ kitchen "to ensure that the food [wa]s being prepared in compliance with the menu, recipes, and any special diets that the inmates ha[d] on file with the kitchen." J.A. 323. Lieutenant Kevin Laurin was responsible for overseeing CCJ's grievance program, supervising sergeants, and managing the day-to-day activities of the jail. Sergeant Margaret Clancy[4] was responsible for supervising correctional officers, documenting reports, and maintaining safety. The remaining defendants—Eric Blaise, Thomas Perry, Robert Webb, and Joshua Wingler—were correctional officers (COs).

---

[3] Glenn Schroyer, Jim Alger, and CCJ were defendants below but are not involved in this appeal. Brandon did not appeal the dismissal of the claims against Alger and CCJ. Although Brandon did name Schroyer in the appeal, his brief stated, "No claims are raised against Schroyer in this appeal." Appellant's Br. at 10. Accordingly, we dismissed the appeal against Schroyer on March 5, 2019.

[4] The briefs and the record are inconsistent in the spelling of Clancy's and Webb's names. We use the spelling as signed by the defendants in their own affidavits.

5

## A. Religious Meals

Brandon's Amended Complaint claims that the defendants denied him religiously appropriate meals by repeatedly serving him meals containing pork.[5] The allegedly noncompliant meals fall primarily into two categories. First, Brandon claims that CCJ failed to notify the kitchen about his religious diet until several months after he had informed the jail that he was a Muslim and did not eat pork. He attests that, during the period in which the kitchen was unaware of his diet, he was "routinely and continuously" served pork whenever it was scheduled on the menu. J.A. 30. Second, Brandon claims that, even after the kitchen was notified of his diet, he was still served pork on a number of occasions, which are specifically identified by date in his Amended Complaint. *See* J.A. 28-40. The defendants dispute both sets of allegations.

While the parties agree that Brandon requested a Muslim diet on March 2, 2012, the record contains conflicting evidence as to when the CCJ kitchen was notified of that dietary restriction. Laurin's affidavit states that, after Brandon made his March 2 request, a notification was placed in his file that he should be

---

[5] Brandon's Amended Complaint was sworn under penalty of perjury. Therefore, his allegations in the complaint can be considered as evidence for summary judgment purposes. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

provided with a no-pork diet. Bedard's response to Brandon's interrogatories similarly state that "[t]he Kitchen staff was notified of Plaintiff's religious diet from the booking officer on or about March 2, 2012." J.A. 356.

Other evidence, however, indicates that the kitchen was not aware of Brandon's religious diet until September or October 2012. On September 27, in response to a grievance filed by Brandon, Laurin noted that the kitchen "did not have that [Brandon was] Muslim" and that it had now been so informed. J.A. 101. Then, on October 5, Laurin wrote, "Brandon was not marked in the kitchen as [M]uslim diet. That was corrected 10/5/12." J.A. 389. Corroborating this account, a CO not involved in the case noted on October 10 that "until recently they had nothing stating that inmate Brandon was a no pork diet." J.A. 114.

Brandon's Amended Complaint states that, before the kitchen was notified of his religious diet, he was "routinely and continuously" served meals containing pork. J.A. 34. He introduced into evidence a schedule of CCJ's menus by day from January 8 to December 29, 2012. J.A. 470-519. On these menus, Brandon identified examples of items that he believed contained pork, such as, *inter alia*, grilled ham and cheese sandwich, barbeque ribs, pepperoni pizza, baked ham-steak, and Italian sausage.

7

On May 28, 2012, Brandon filed his first grievance with CCJ, claiming that his meals contained pork and thereby violated his religious diet. Brandon filed additional complaints on June 21, July 4, and July 6, again alleging that his meals did not comply with his religious beliefs. To these grievances, Kinter responded that medical staff were not responsible for religious diets and that Brandon would need to "ask security staff to submit [a] diet slip for pork." J.A. 84 (emphasis omitted). Brandon claims that he then spoke with the security staff, who told him instead to ask the medical staff. He contends that neither group resolved his complaints.

Brandon argues that he continued to be regularly served pork until the kitchen was finally notified of his religious diet in September or October 2012. Using the earlier September 27 date, *see supra* at 5, and the schedule of CCJ menus for this time period, Brandon's counsel calculates that he was served pork at least 63 times. Brandon's Amended Complaint, however, does not include any specific dates between July 6 and September 9 on which he alleges that he was served a noncompliant meal. Nor does the record contain any religious meal-related grievances during this period.

After July 6, the next recorded incident in which Brandon claims to have received pork occurred on September 9. Brandon attests that he was served ham steak on that date. Brandon's Amended Complaint claims that he was served pork again on September 24 (BLT sandwich for lunch and salad with bacon strips for dinner), October 9 (ham sandwich), October 10 (salad with ham strips), October 17 (pork inside "meatless" salad), October 29 (pork inside "vegetarian" bean soup), November 5 (pork inside "meatless" salad), and December 25 (BBQ pork ribs). Brandon concedes that, besides these dates, he generally received religiously appropriate meals after October 5, the last date on which Laurin claims to have notified the kitchen of Brandon's religious diet.

Regarding several of the above incidents—those on October 17, October 29, and November 5—Brandon attests that the meals were labeled "meatless" or "vegetarian." But, according to Brandon, when he inspected the meal, he discovered small pieces of pork inside. He claims that, on each occasion, he compared his meal to that given to other Muslim inmates and discovered that his meal was the only one containing small pieces of meat. Based on the differences only in his meals, Brandon concluded that he was being specifically targeted and decided that he needed to inspect carefully each meal prior to eating it.

The defendants dispute Brandon's allegations and argue that he was never deprived of a religiously appropriate meal. Rather, they claim that each time Brandon complained about pork in his meal, the meal either did not actually contain pork or was replaced. According to the defendants, Brandon's continued grievances resulted not from continued violations, but from Brandon's refusal to accept the defendants' explanations. There is some evidence to support the defendants' claim that, beginning in September, a number of the complained-of meals were either explained or replaced.[6] There is also, however, contradictory evidence in the form of Brandon's sworn statements.

According to the defendants, six of the meals specifically grieved by Brandon—those on September 9, September 24 (lunch and dinner), October 9, October 10, and November 5—did not actually contain pork. On September 9, Brandon complained that his ham steak contained pork. A CO not involved in this case checked with the kitchen and informed Brandon that the ham steak was made with turkey, not pork. He told Brandon that, because of the number of inmates

---

[6] The evidence on which the defendants rely does not cover all of the dates on which Brandon alleges that he was served pork. There is nothing in the record to indicate that Brandon was provided with a replacement meal or told that his meal did not contain pork on May 28, June 21, July 4, or October 29.

with religious restrictions, the kitchen did not use pork products in any of its meals.

There is conflicting evidence in the record, however, suggesting that the ham steak Brandon received actually did contain pork. For instance, on Brandon's grievance, the supervising CO wrote that "it is very likely that inmate Brandon received pork on Sept. 9." J.A. 114. Similarly, Laurin also noted, in response to a later grievance, that Brandon had "not received pork or pork products . . . *since 9/9/12*." J.A. 119 (emphasis added). Finally, Brandon avers that, on another occasion, a different CO told him that the only meal at CCJ that contained pork was the ham steak.

Regarding Brandon's grievances on September 24, Laurin wrote that the bacon in his meals was veggie bacon. Similarly, he wrote that the ham in Brandon's October 9 and October 10 meals was turkey ham. But the grievances also note that Laurin met with Bedard to tell him "no more mistakes," and "if there are mistakes[,] they are to be corrected." J.A. 109, 111.

Finally, the parties agree that, on November 5, Webb told Brandon that the pepperoni inside his "meatless" macaroni salad was turkey, not pork. In Brandon's Amended Complaint, however, he gives reasons to doubt Webb's

11

statement. He states that, unlike the other COs who responded to his prior complaints, Webb claimed that the pepperoni was not pork without first going to the kitchen to investigate. Brandon further attests that, when he asked for a grievance form, Webb responded, "If you grieve this, I won't get you a replacement." J.A. 38. Brandon then asked Webb to confirm with the kitchen that the pepperoni was turkey. He claims that Webb made a show of pretending to call the kitchen but refused to disclose to Brandon who in the kitchen had actually confirmed that the pepperoni was not pork.

Of the remaining dates, the defendants claim that, while the meals on October 17 and December 25 did initially contain pork, they were ultimately replaced with religiously compliant meals. On October 17, Brandon attests that he found small pieces of pork in his "meatless" salad. He acknowledges that he received a peanut butter and jelly sandwich as a replacement.

According to Brandon, Clancy investigated the grievance the next day and determined that a new chef unfamiliar with Brandon's religious diet had included pork in the meal by mistake. According to Brandon's Amended Complaint, she told him that "it was an honest mistake and [he] should leave it as that." J.A. 36. When Brandon asked her to state her findings on the grievance form, however,

she refused, stating, "No, because I don't want this to later bite me in the ass." J.A. 36. Brandon attests that he then heard her say to Blaise, "If he grieves another tray, I'm going to lock his ass up!" J.A. 36.

Regarding the pork ribs that Brandon was served on December 25, a CO noted on Brandon's grievance form that "[y]our meal was addressed and changed to accommodate your needs." J.A. 177. Brandon attests, however, that when he complained about the pork, Perry smiled at him and responded, "C'mon Brandon, where's your holiday spirit?" J.A. 39. Brandon states that he then engaged in a shouting match with Perry over the meal until Perry threatened him with pepper spray and restraints.

Significantly, the defendants make no claim that Brandon's October 29 meal was replaced or did not contain pork. Brandon avers that he discovered pieces of ham in his "vegetarian" bean soup. As mentioned above, he compared his soup with that of other Muslim inmates and discovered that only his soup contained meat. According to the Amended Complaint, when Brandon complained about the soup, a CO not involved in this case informed him that Bedard had admitted to accidentally using the ladle from the regular bean soup to serve Brandon's vegetarian soup.

13

## B. Removal from Medical Diet

Besides his religious diet, Brandon also had a special medical diet. On January 14, 2012, Brandon reported that he was allergic to shellfish, and Dr. Glenn Schroyer removed shellfish from his diet. On March 22, Brandon reported that tomatoes gave him severe acid reflux, and Dr. Schroyer also removed tomatoes from his diet. Lastly, on May 21, Dr. Schroyer concluded that Brandon had high cholesterol and placed him on a low-fat, low-cholesterol diet.

In addition to the grievances mentioned above concerning his religious diet, Brandon filed numerous other grievances complaining that his meals did not comply with his medical diet. On several occasions, he also filed grievances complaining that his meal-related grievances, both medical and religious, had not been answered. He attests that he requested the addresses of outside agencies, such as the Citizen's Policy and Complaint Review Council (CPCRC), in order to seek assistance with his case. Brandon claims to have filed a total of 41 grievances related to his meals, 8 of which were filed between September 27 and October 15.

Brandon's Amended Complaint attests that, on October 15, Laurin ordered him to attend an informal hearing. According to Brandon, Laurin was "irate" and "ranting and raving" because Brandon had requested CPCRC's address. J.A. 25.

14

Brandon claims that Laurin shouted, "No one will get into Clinton County's business!" J.A. 25. He further states that Laurin asked him, "If you was [sic] so concerned with your health as you're making it out to be, why are you buying nutty bars and oatmeal creampies from [the] commissary?" J.A. 25. The record indicates that Brandon had indeed occasionally purchased cookies and candies high in fat content and Ramen containing tomato powder. Brandon avers that he bought those items in case he could not eat the meals provided by the kitchen.

The next day, on October 16, Dr. Schroyer and Kinter informed Brandon that, because he had made commissary purchases that did not comply with his medical diet, they were removing his medical dietary restrictions. Brandon argues that they only investigated his commissary purchases in retaliation for the grievances he had filed. He claims that, after he told Kinter that he would refuse to eat the meals that did not comply with his dietary needs, she responded, "You can starve for all I care, since you want to knit [sic] pick and complain about everything, you'll get what we give you." J.A. 26. Additionally, Laurin's grievance investigation report of the incident states, "As has been done in the past when a large amount of grievances are filed on diets[,] the commissary receipts are reviewed." J.A. 203.

After October 16, Brandon was no longer given meals that were low-fat, low-cholesterol, shellfish-free, and tomato-free. (His religious pork-free diet, however, remained in place.) Brandon filed multiple grievances complaining that he needed his medical diet to be reinstated. On November 21, Dr. Schroyer and Kinter reinstated Brandon's medical diet, on the condition that he purchase from the commissary only items that complied with that diet.

## C. Assault

Finally, Brandon attests that, on November 17, 2012, Clancy and Blaise placed another inmate, "Tiny," into the cell next to Brandon's. Tiny had been transferred for attacking another inmate. According to Brandon's Amended Complaint, Clancy and Tiny were yelling at each other, and Brandon overheard Clancy say, "[L]et[']s see if he tries that shit on Brandon!" J.A. 48.

Brandon avers that, two days later, Blaise ordered Brandon to retrieve the lunch trays from the front of each cell. Brandon informed Blaise that Tiny had verbally assaulted him the previous night and that he "would rather not pick[ ]up Tiny's tray." J.A. 48. Brandon claims that Blaise responded, "[D]on't worry about him, he's a punk. Besides, from what I heard, I'm sure if I let him out, you'd kick his ass." J.A. 48. Brandon then proceeded to collect Tiny's tray. While he was doing

16

so, Tiny became hostile and spat on him. Brandon avers that Blaise laughed and stated, "I can't believe he f***ing spit on you!" J.A. 48. Brandon further attests that, when he asked for a grievance form, Blaise responded, "[G]ive me a break Brandon, you know you had that coming." J.A. 48-49.

### D. Procedural History

On August 15, 2014, Brandon filed the pro se Amended Complaint, alleging that the defendants had denied his right to free exercise of religion under the First Amendment, had been deliberately indifferent to his medical needs in violation of the Eighth Amendment, had violated the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.*, and had conspired with each other to do all of the above. Because Brandon appeared pro se below, the district court also liberally construed his Amended Complaint to raise a First Amendment retaliation claim. But the district court did not articulate what it believed Brandon's retaliation claim to be. The defendants moved for summary judgment, and the case was referred to a magistrate judge. Based on the magistrate judge's Report and Recommendation, the district court granted summary judgment to the defendants on all of Brandon's claims. Brandon appeals only the dismissal of his free exercise claim and his retaliation claim.

17

Regarding Brandon's free exercise claim, the court below found that there was "evidence in the record to support a factfinder's conclusion that plaintiff was initially served a meal that contained pork, which is inconsistent with his religious beliefs, on only ten occasions between March 28, 2012 and December 25, 2012." S.A. 51-52. The court then concluded that being served 10 meals containing pork was not a substantial burden on Brandon's religious beliefs.

## DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008). Summary judgment may be granted "only if the court concludes that the case presents 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). A "genuine issue" exists—and summary judgment is therefore improper—"where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). In reviewing the district court's grant of summary judgment, we must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Id.*

18

**B.** **Free Exercise Claim**

Brandon argues that there is evidence in the record to show that the defendants deprived him of at least 63 religiously compliant meals. The defendants do not dispute that 63 noncompliant meals would be a substantial burden; they argue instead that no reasonable jury could find that Brandon was denied more than 10 religiously compliant meals. In the alternative, Brandon argues that, even if the evidence shows only that he was deprived of 10 meals, those 10 noncompliant meals would still satisfy the substantial burden requirement. We agree with Brandon on both arguments and consider either to be a sufficient, independent basis for reversal and remand.

*1. Standard for First Amendment Free Exercise Claims*

Prisoners have "long been understood to retain some measure of" their rights under the Free Exercise Clause. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). These rights, however, must be balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* We therefore judge prisoners' free exercise claims "under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* First, a "prisoner must

show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."[7] *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014). If the prisoner satisfies these threshold requirements, a defendant can still avoid liability by showing that his or her conduct is "reasonably related to legitimate penological interests." *Id.* at 222. The only element of Brandon's free exercise claim that is at issue in this appeal is whether the defendants' actions placed a substantial burden on his religious beliefs.[8]

Determining whether a plaintiff's free exercise rights have been substantially burdened "requires courts to distinguish important from unimportant religious beliefs, a task for which we have already explained courts are particularly ill-suited." *Ford*, 352 F.3d at 593. As a result, our Circuit's

---

[7] Our Circuit has not yet decided whether the substantial burden requirement remains good law after the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872, 887 (1990). The Supreme Court's language in *Smith* "took issue with the premise that courts can differentiate between substantial and insubstantial burdens." *Ford*, 352 F.3d at 592 (citing *Smith*, 494 U.S. at 887). Other circuits have disagreed over whether the substantial burden test continues to apply to free exercise claims in the aftermath of *Smith*. *Id.* (comparing *Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003), with *Levitan v. Ashcroft*, 281 F.3d 1313, 1320-21 (D.C. Cir. 2002)).

Whenever the question has arisen in our Circuit, the panel has avoided answering it by noting either that the parties did not brief the issue or that the requirement, even if applied, would have been satisfied. *See, e.g.*, *Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) (summary order); *Holland*, 758 F.3d at 220; *Ford*, 352 F.3d at 588. Because neither party has briefed the issue here, we likewise assume, without deciding, that Brandon's free exercise claim is subject to the substantial burden requirement. *See* Appellant's Reply Br. at 19 (acknowledging that "it is not necessary for the Court to decide the issue in this case").

[8] The parties agree that Brandon's beliefs are religious and sincerely held. Additionally, the defendants do not assert any legitimate penological interest for denying Brandon religiously compliant meals.

precedents have been appropriately wary of making "conclusory judgments about the unimportance of the religious practice to the adherent." *Id.* While the substantial burden requirement presupposes that "there will be cases in which it comfortably could be said that a belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis," *id.*, establishing a substantial burden is "not a particularly onerous task," *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004).

## 2. *Number of Meals*

Since "at least as early as 1975," our Circuit has "generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Id.* at 203; *see also Ford*, 352 F.3d at 597 (holding that prisoners have a "clearly established" right "to a diet consistent with [their] religious scruples"). Acknowledging this precedent, the defendants nonetheless argue that Brandon introduced evidence showing that he was denied only 10 religiously compliant meals and that 10 meals is too few to constitute a substantial burden.

We disagree and hold that Brandon has introduced evidence to create a genuine dispute of material fact that he was denied enough religiously compliant

meals to burden substantially his religious beliefs. We do so on two alternative grounds, each of which would be sufficient on its own to justify reversal.

First, we hold that the court below erred in finding that the record contained evidence that Brandon was served pork only 10 times. The magistrate judge identified the following 10 incidents allegedly involving pork: June 21; July 4; twice on September 24; October 9, 10, 17, and 29; November 5; and December 25. In doing so, the magistrate judge appears to have overlooked the May 28 and September 9 grievances. More problematically, he considered only those incidents that were specifically identified by date in the record. The magistrate judge thereby ignored the evidence that, before the kitchen was notified of Brandon's religious diet in September or October 2012, the defendants "routinely and continuously" deprived Brandon of religiously compliant meals. J.A. 34.

Brandon introduced evidence—in the form of his sworn Amended Complaint, his Affidavit in Opposition to Summary Judgment, and his Objection to the Report and Recommendation[9]—on the basis of which a reasonable jury

---

[9] We reject the defendants' argument that Brandon's Affidavit in Opposition is a "sham affidavit." Appellee's Suppl. Mem. at 4-5. The defendants address their argument only to Brandon's Affidavit, but we expand our discussion to include also his Objection to the Report and Recommendation, which has similar characteristics. It is true that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Therefore, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Id.*

could find that he was denied many more than 10 religiously compliant meals. In his Amended Complaint, Brandon avers, "From January 14th, 2012 through October 8th, 2012, I was deprived of a right to practice religion . . . . [M]y religious diet was routinely and continuously not complied with, prior to and after a religious dietary notice was issued." J.A. 34. He further states that the incidents identified by date in the Amended Complaint "are just a few of many violations mentioned while in the custody of CCJ. To repeat every incident would be duplicious [sic] in nature." J.A. 40.

---

Neither Brandon's Affidavit in Opposition nor his Objection to the Report and Recommendation, however, contradict his prior deposition testimony.

Brandon's affidavit states that the "defendants failed/refused to issue Plaintiff a religious diet until October 5th, 2012." Appellant's Aff. at 11. His Objection then calculates, based on CCJ menus that are attached as exhibits, that Brandon was served pork 92 times between March 28 and December 25. J.A. 461. The defendants argue that these statements contradict Brandon's deposition, in which he testified that he could not recall the number of times that he was served pork.

Contrary to the defendants' characterization, however, Brandon's deposition does not contradict his Affidavit or Objection. Our Circuit has declined to disregard an affidavit as a "sham" in cases where "there is a readily apparent, plausible explanation" for the inconsistency, *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205-06 (2d Cir. 2014), or where the deposition is "only arguably contradictory" to the affidavit, *Hayes*, 84 F.3d at 620. *See also In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193-94 (2d Cir. 2013) (per curiam). In this case, when asked during the deposition how many times he was served pork, Brandon answered "multiple" times but stated that he could not remember an exact number. Suppl. A. 39-41. This is not inconsistent with the fact that he was "routinely and continuously" served pork, as it is not unreasonable that he might not remember exactly how many times over the course of many months such servings occurred. Nor is his deposition testimony inconsistent with the fact that he later provided a specific number in his Objection. He was able to calculate such a number after consulting the CCJ menus, and he stated at his deposition, "You have to apprise me of the menu and I can possibly answer that better." Suppl. A. 40. Under these circumstances, we reject the defendants' claim that the Affidavit or the Objection is a sham. We hold that the Affidavit and Objection can both be considered, alongside the Amended Complaint, in determining whether a genuine issue of material fact exists.

The inference that Brandon was "routinely and continuously" served pork prior to September or October 2012 is supported by evidence in the record that the kitchen was not notified of his religious diet until then. Based on Brandon's grievances and the defendants' affidavits, there is a genuine dispute of material fact as to whether the kitchen was notified of Brandon's religious diet on March 2, September 27, or October 5. Thus, on September 27, Laurin wrote that the kitchen "did not have that [Brandon] w[as] Muslim" and had now been informed. J.A. 101. Then, on October 5, Laurin wrote, "Brandon was not marked in the kitchen as [M]uslim diet. That was corrected 10/5/12." J.A. 389.

At summary judgment, we draw all inferences in favor of the non-moving party. Accordingly, we hold that a reasonable jury could find that the kitchen was not notified of Brandon's religious diet until the end of September or beginning of October. A jury could then reasonably infer that, prior to being notified that Brandon did not eat pork, the kitchen did not know to make any accommodations for him and therefore served him pork whenever it was scheduled on the menu.

Brandon introduced into evidence the CCJ menus for 2012. Using these menus, his counsel calculated that, between March 2 and September 27, he was served at least 63 meals containing pork. While this number is an estimate based

on Brandon's counsel's assessment of which meal items likely contained pork, an exact number is not required for Brandon's claim to survive summary judgment. It is sufficient that the menus, coupled with the evidence that the kitchen was not alerted to Brandon's religious diet until September or October, give rise to a reasonable inference that Brandon was served many more than 10 meals containing pork.

The court below therefore erred in holding that the evidence showed that Brandon was denied only 10 religiously compliant meals. The defendants have not disputed that 63 (or some comparable number of) meals would be a substantial burden. Indeed, it is hard to imagine how they could sincerely argue to the contrary. Accordingly, the error discussed above is sufficient to justify remand. Because a genuine dispute exists, the factual question of how many noncompliant meals Brandon was served is for the jury to decide.[10]

---

[10] The defendants do argue that some of the allegedly noncompliant meals did not actually contain pork and instead used substitutes such as turkey ham or veggie bacon. They argue that others were replaced after Brandon complained. Whether this is true or not is also a question of fact for the jury to decide. While there is some evidence in the record to support the defendants' arguments, at least for some of the incidents identified, Brandon has also introduced evidence to the contrary. For instance, the defendants argue that the bacon served to Brandon on September 9 was veggie bacon, but Laurin's own notes indicate that Brandon was served pork on September 9. J.A. 119. The defendants also argue that Brandon was given a replacement meal on October 17 and December 25, but Brandon's sworn statements give a different account of both those incidents. Since a genuine dispute of material fact exists as to whether some of the allegedly noncompliant meals were either pork-free or replaced, summary judgment on this ground is inappropriate.

While the above error by itself justifies a remand, we additionally hold, in the interest of judicial economy, that the court below made a second error when it concluded that no reasonable jury could find that the denial of 10 meals was a substantial burden.

In the context of religious feasts and fasting, our Circuit has previously held that a small number of noncompliant meals—even a single violation—can be a substantial burden. Thus, in *Ford v. McGinnis*, we held that the plaintiff's religious beliefs were substantially burdened by his inability to participate in the Eid ul Fitr feast. *Ford*, 352 F.3d at 593. In that case, the denial of a single feast constituted a substantial burden.

Similarly, in *McEachin v. McGuinnis*, we held that a 7-day restrictive diet was a substantial burden when it was imposed during Ramadan and therefore interfered with the prisoner's breaking of the fast. *McEachin*, 357 F.3d at 201; *see also Williams v. Does*, 639 F. App'x 55, 56-57 (2d Cir. 2016) (summary order) (holding that serving a few meals prematurely during Ramadan was a substantial burden and rejecting the lower court's reasoning that the "burden was *de minimis* because only a few of [the plaintiff's] meals were delivered prematurely").

26

Finally, in *Holland v. Goord*, our Circuit held that the defendants substantially burdened the plaintiff's religious beliefs by ordering him to drink water during Ramadan in order to provide a urine sample for drug testing. *Holland*, 758 F.3d at 221. Drinking water would have violated the plaintiff's fast, which the panel in *Holland* noted would have been a "grave sin." *Id.* at 222. The *Holland* panel rejected the district court's conclusion that, because the plaintiff could "make up a premature drink of water with one extra day of fasting," the burden was only de minimis. *Id.* (internal quotation marks omitted). In all four of the aforementioned cases, the relatively small number of violative incidents did not prevent us from finding that the prisoner's religious beliefs were substantially burdened.

The defendants attempt to distinguish these cases by noting that they all involved meals or drinks that took place as part of a religious feast or during Ramadan. The defendants argue that the feast or holiday endowed the meals with special significance. They contrast Brandon's case, in which none of the noncompliant meals identified by date in the record occurred during Ramadan or another holiday. The defendants' emphasis on this distinction, however, is misplaced. Their argument misunderstands the role of the holiday in the prior

panels' analyses and would require this Court to draw precisely those lines that we have held we are "particularly ill-suited" to draw. *Ford*, 352 F.3d at 593.

The meals and drinks in *McEachin*, *Williams*, and *Holland* were violations of Muslim law because they occurred during Ramadan. Drinking water or eating prematurely, for example, is not prohibited except during fasts. This is why it was important that the defendants' conduct in those cases occurred during Ramadan. Our holding was that Ramadan made the prisoner's eating or drinking a sin; it was *not* that Ramadan made that sin especially significant.

For Muslims who follow Islamic dietary laws, consuming pork is a sin at any time, regardless of whether the consumption occurs during a holiday or not. The Quran expressly commands against it. *See, e.g., Quran* 2:173. Accordingly, when Muslim inmates are served meals containing pork, they are faced with the choice of disobeying the commands of their faith or not eating. We have correctly recognized that it is not generally the role of courts to distinguish between important and unimportant religious beliefs. *Ford*, 352 F.3d at 593. And we should be reluctant to draw lines that would distinguish and require us to give more importance to some religious commands (such as fasting during Ramadan) over others (such as abstaining from the consumption of pork). The defendants give us

no good reason to make such distinctions here. Indeed, it would be absurd to require that courts, in order to determine what constitutes a substantial burden, be made to decide the number of violations of a particular religious tenet that make a sin grievous. Yet that is what the defendants' arguments would force us to do.

We, therefore, hold that, even if the evidence had shown that Brandon was denied only the 10 meals that were specifically identified by the magistrate judge, the court below still erred in concluding, as a matter of law, that those 10 meals did not constitute a substantial burden.[11]

For both of the reasons discussed above, the district court erred in granting summary judgment to the defendants on Brandon's free exercise claim.

### 3. *Personal Involvement*

The above errors do not end the inquiry, however. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v.*

---

[11] We express no opinion as to whether a single meal or a smaller number of meals spread out over a longer period of time might perhaps be considered isolated incidents, such that the burden they impose is de minimis. *See, e.g.*, *Colvin v. Caruso*, 605 F.3d 282, 293 (6th Cir. 2010) (finding no First Amendment violation where the plaintiff alleged "only isolated incidents" of being served non-kosher food); *Gallagher v. Shelton*, 587 F.3d 1063, 1071 (10th Cir. 2009) (finding that a single "isolated act of negligence" of using non-kosher utensils was not a First Amendment violation); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (finding that 3 noncompliant meals out of 810 meals served to the plaintiff did not violate the First Amendment). On the facts before us, a reasonable jury could readily find that the 10 meals were not isolated incidents and hence that they imposed a substantial burden on Brandon's religious beliefs.

*Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal citation omitted). We must determine, therefore, whether there is evidence that each individual defendant was personally involved in denying Brandon religiously compliant meals.

Most cases addressing personal involvement do so in the context of supervisory defendants. A supervisory official is personally involved if

> (1) [he or she] participated directly in the alleged constitutional violation, (2) [he or she], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) [he or she] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) [he or she] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) [he or she] exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In this case, four of the defendants—Kinter, Bedard, Laurin, and Clancy—were supervisors. Brandon has introduced evidence showing that, under the second prong enumerated above, all four supervisory defendants were aware of his grievances and failed to remedy the recurring wrong.

Bedard concedes in his affidavit that he was aware that Brandon had filed grievances about his meals. He further admits that he was responsible for discussing "the components or ingredients of meals with the COs, and how this

related to any restrictions the kitchen had on file for various inmates, in attempts to resolve any issues regarding an inmate being served a non-compliant meal."[12] J.A. 325.

There is also evidence that Kinter, Laurin, and Clancy were each aware of Brandon's complaints. All three of them had signed off on one or more of Brandon's grievance forms. Clancy, for example, investigated Brandon's claim that there was pork in his meatless salad on October 17. Brandon avers that many of the grievances he filed went unanswered and that he continued to be served meals containing pork.

This evidence, therefore, is sufficient to create a genuine dispute as to whether the four supervisory defendants were "informed of the violation through a report or appeal" and "failed to remedy the wrong." *Colon*, 58 F.3d at 873.

The remaining CO defendants are not supervisory officials, so we consider only whether they participated directly in the violation. Brandon's sworn statements contain evidence that Webb and Perry each directly participated in at least one incident involving a noncompliant meal. Brandon attests that, on

---

[12] Brandon also introduced evidence that Bedard participated directly in at least one violation. Brandon attests that, on October 29, Bedard admitted to using the serving spoon from the regular bean soup, which contained pork, to serve Brandon's vegetarian bean soup.

November 5, he complained to Webb that there was pepperoni in his meal. Brandon claims that, without asking the kitchen, Webb told Brandon that the pepperoni was turkey, not pork, and further stated, "If you grieve this, I won't get you a replacement." J.A. 38. As for Perry, Brandon states that, on December 25, he complained to Perry that he could not eat the pork ribs that he was served. Brandon claims that Perry responded, "C'mon Brandon, where's your holiday spirit?" J.A. 39.

On the other hand, there is no evidence that either Blaise or Wingler was personally involved in denying Brandon a religiously compliant meal. The record does not indicate that either of them responded to any of Brandon's grievances about his religious diet. Accordingly, we affirm the dismissal of Brandon's free exercise claim against Blaise and Wingler. We, however, permit Brandon to proceed on the claim against the other six defendants before us.

### 4. *Two Possible Defenses*

The defendants raise two additional defenses that need to be addressed. They claim that there is not sufficient evidence of intent to violate Brandon's First Amendment rights. And they assert that they are entitled to qualified immunity.

### a. Mental State

Defendants argue that, for a First Amendment violation, Brandon must show that each defendant had a requisite mental state. They do not specify what they believe that mental state to be. They claim only that "mere negligence is insufficient as a matter of law to state a claim under section 1983." Appellees' Br. at 13 (quoting *Poe v. Leonard*, 282 F.3d 123, 145 (2d Cir. 2002); and citing *Davidson v. Cannon*, 474 U.S. 344, 347 (1986)).

The cases on which defendants rely do not hold that all claims under § 1983 require a mental state greater than negligence. *See Davidson v. Cannon*, 474 U.S. 344 (1986) (holding only that negligence is not sufficient to establish liability under the Due Process Clause); *Poe v. Leonard*, 282 F.3d 123, 145-46 (2d Cir. 2002) (holding that negligence is insufficient to support a finding of liability under two definitions of personal involvement that expressly require gross negligence or deliberate indifference). To the contrary, the § 1983 statute "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels v. Williams*, 474 U.S. 327, 330 (1986). *Daniels* does not foreclose all § 1983 claims based on negligence. The Supreme Court simply stated that, "*depending on the right*, merely negligent conduct may not be enough to state

a claim" and expressly declined to "rule out the possibility that there are other constitutional provisions that would be violated by mere lack of care." *Id.* at 328, 330 (emphasis added).

Our Circuit has not stated whether a First Amendment free exercise claim requires more than negligence, and we need not do so here. Even assuming *arguendo* that it does, in the instant case, as we will outline shortly, Brandon has introduced sufficient evidence to create a genuine dispute as to whether the defendants acted with deliberate indifference in serving him pork. Under our holding in *Greenwich Citizens Communications*, 77 F.3d 26 (2d Cir. 1996), deliberate indifference clearly suffices. We, therefore, decline to reach the question of whether something less than deliberate indifference—like negligence—would also be sufficient to establish an affirmative First Amendment claim.

As outlined earlier, evidence in the record indicates that each of the defendants who could be found to have been personally involved was aware that Brandon had complained at least once about being served a meal containing pork. These defendants either directly received a complaint from Brandon during mealtime or signed off on a grievance that he filed. And, despite the defendants' awareness of the problem, there is evidence both that Brandon continued to be

served noncompliant meals and that, on at least three occasions, Brandon found meat in his "meatless" meal while other Muslim detainees had no meat in their meals. It follows that a reasonable jury could infer from this difference in treatment that Brandon was being specifically targeted for noncompliant meals. Moreover, a jury could also find that several of the defendants made statements that support an inference of deliberate indifference as to this treatment. For example, there is evidence that Perry replied to Brandon's complaint by saying, "C'mon Brandon, where's your holiday spirit?"; that Webb stated, "If you grieve this, I won't get you a replacement"; and that Kinter stated, "You can starve for all I care, since you want to knit [sic] pick and complain about everything, you'll get what we give you." J.A. 26, 38-39.

We conclude that a reasonable jury could find that the defendants acted with deliberate indifference to Brandon's free exercise rights. Accordingly, and for those reasons, we need not decide at this time whether negligence would also be sufficient to state a claim under the Free Exercise Clause.

### b. __Qualified Immunity__

Defendants also argue that they are entitled to summary judgment on the ground of qualified immunity.[13] We disagree. A defendant is entitled to qualified immunity if "(1) [the defendant's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for [the defendant] to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (internal quotation marks omitted).

It is clearly established law in our Circuit that "to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin*, 357 F.3d at 201. The defendants contend, however, that the law was not clearly established as to how many religiously compliant meals must be denied before the prisoner's religious beliefs are substantially burdened. Assuming *arguendo* that this is so, the argument cannot save them. As discussed above, a genuine dispute of material fact exists as to the number of noncompliant meals that Brandon was served. Based on the evidence in the record, a reasonable jury could find that Brandon was denied 63 religiously

---

[13] The defendants raise their qualified immunity defense only against Brandon's free exercise claim. They make no mention of such a defense against Brandon's retaliation claim.

appropriate meals. And the defendants make no argument that a reasonable officer would have believed that 63 noncompliant meals was not a substantial burden.[14]

## C. Retaliation Claim

In addition to his free exercise claim, Brandon also alleges that the defendants violated the First Amendment by retaliating against him for filing meal-related grievances. While the nature of his retaliation claim was somewhat unclear before the court below, he now identifies three retaliatory actions.

---

[14] The defendants may, of course, still argue at trial that they reasonably believed that the meals actually did not contain pork. But because genuine disputes exist as to the facts underlying such a defense, we cannot grant summary judgment to the defendants on such a ground.

We today also hold that even the 10 meals that concededly contained pork violated Brandon's rights. Given the material dispute as to the number of pork-containing meals that were served to Brandon, we need not today decide what number of meals would constitute a sufficiently clear violation of Brandon's rights as to preclude a qualified immunity defense.

Brandon asserts that, in retaliation for exercising his First Amendment right to file grievances, (1) Kinter and Laurin removed his medical diet, (2) Bedard intentionally served him meals containing pork, and (3) Clancy and Blaise exposed him to being spat on by another inmate.[15] The defendants argue that Brandon has not introduced evidence sufficient to allow a reasonable jury to find that they retaliated against him. We disagree and hold that genuine disputes of material fact exist as to Brandon's retaliation claims.

### 1. Standard for First Amendment Retaliation Claims

To establish a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). The defendant may nonetheless avoid liability by showing that he or she would have taken the adverse action "even in the absence of the protected conduct." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

---

[15] Although Brandon asserts his retaliation claim against all the defendants, he makes no allegations that Wingler, Webb, or Perry were personally involved in any of the retaliatory actions against him. Accordingly, we affirm the dismissal of the retaliation claims as to those defendants, and we consider the retaliation claim only against Bedard, Kinter, Laurin, Clancy, and Blaise.

The filing of prison grievances is a protected activity. *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003). Therefore, the first element of Brandon's retaliation claim is satisfied, and we need consider only the latter two elements.

An adverse action is defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Id.* at 353. It might seem that, because Brandon continued to file grievances even after the alleged retaliation, the defendants' actions were not sufficiently adverse. But such a view misperceives what constitutes adverse action. The test is objective, and the plaintiff is not required to show that he was actually deterred. *Gill*, 389 F.3d at 381. Thus, our Circuit has permitted retaliation claims to proceed when a reasonable inmate would be deterred, even though the particular plaintiff continued to file grievances. *Id.* For, as we have stated, a prisoner "should not be denied remedy because his extraordinary efforts resulted in the resolution of grievances that would have deterred a similarly situated individual of ordinary firmness." *Id.*; *see also Davis*, 320 F.3d at 353.

Once an adverse action is adequately shown, a plaintiff must still introduce evidence "sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354. That is, a plaintiff must establish

a causal connection between the defendants' actions and the adverse action. And, as mentioned earlier, mere negligence is not enough to support a claim of retaliation. A plaintiff must show some evidence of retaliatory intent to cause the adverse effect. *Greenwich Citizens Comm.*, 77 F.3d at 31.

One way a plaintiff can establish a causal connection is by "showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Our Circuit has declined to draw a bright line as to how close in time the events must be. We have instead called on courts to exercise "judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.*

With these standards in mind, we address each of Brandon's retaliation claims.

### 2. *Removal of Brandon's Medical Diet*

A reasonable jury could conclude that the removal of medical dietary restrictions would deter an inmate of ordinary firmness from filing further grievances. We therefore hold that Brandon has introduced sufficient evidence to support his claim that Kinter and Laurin took adverse action against him. In Brandon's case, his medical diet ensured that he would not be served foods that

40

he was allergic to, that gave him severe acid reflux, and that could exacerbate his high cholesterol and heart problems. Given the potential consequences for Brandon's health, the removal of his medical diet could reasonably be found to be an adverse action. *See Davis*, 320 F.3d at 353 (finding that "it is possible that there were adverse effects resulting from [the prisoner] not being given his high fiber diet").

Brandon also introduced evidence sufficient to create a genuine dispute as to whether there was a causal connection between Brandon's grievances and Kinter's and Laurin's decision to remove his medical diet.

Brandon relies in part—but only in part—on temporal proximity. He claims that he filed 8 grievances between September 27 and October 15. Then, on October 15, Laurin held an informal hearing at which he asked about Brandon's commissary purchases, and on October 16, Kinter removed Brandon's medical diet, allegedly as a result of those purchases.

The temporal proximity of these events somewhat supports an inference of causation. The strength of that inference is, however, limited by the frequency with which Brandon filed grievances throughout his incarceration. Brandon filed 41 grievances, beginning on May 28. Because of this high number, almost any event

41

during Brandon's incarceration would likely be temporally close to at least one or a few of his grievances. On the other hand, Brandon's temporal proximity argument is strengthened by the fact that a higher concentration of his grievances were filed in September and October, prior to the removal of his medical diet.

We conclude that temporal proximity provides some evidence of causation in this case, but that evidence is not as strong as it would have been had Brandon filed fewer grievances in total.[16]

We need not, however, decide whether Brandon's evidence of temporal proximity is sufficient to survive summary judgment. Significantly, Brandon does not rely exclusively on temporal proximity to establish causation. Additionally, he attests that Kinter and Laurin made statements indicating retaliatory animus. For example, Brandon avers that, at the informal hearing on October 15, Laurin angrily stated, "No one will get into Clinton County's business!" J.A. 25. And that this outburst was in response to his request for the address of CPCRC in order to seek assistance with his complaints. Brandon also attests that, on October 16, Kinter

---

[16] Our reasoning should not be read to imply that a prisoner who has filed a high number of grievances frequently or consistently cannot establish causation by temporal proximity. Our Circuit has chosen to let the determination of what inferences can be made from temporal proximity be based on the particular facts of each case. *See Espinal*, 558 F.3d at 129.

stated, "You can starve for all I care, since you want to knit [sic] pick and complain about everything, you'll get what we give you." J.A. 26.

We agree with Brandon that these statements, combined with the asserted temporal proximity, suffice to permit a jury reasonably to find that Kinter and Laurin were motivated by retaliatory intent when they removed Brandon's medical diet.

Kinter and Laurin argue, however, that they would have removed Brandon's medical diet even if he had not filed any grievances. According to them, his diet was removed because he made commissary purchases that were inconsistent with his diet. But the veracity of this explanation is subject to genuine dispute. There is evidence in the record to show that the commissary records were a pretext for retaliation. Laurin's grievance investigation report states, "As has been done in the past when a large amount of grievances are filed on diets[,] the commissary receipts are reviewed." J.A. 203. Based on that statement, a reasonable jury could find that the defendants would not have investigated Brandon's commissary purchases—and therefore would not have removed his medical diet—had he not filed any grievances.

43

Accordingly, we conclude that the district court erred in granting summary judgment to Laurin and Kinter; on remand, Brandon may proceed on his retaliation claim against them.

### 3. *Intentional Introduction of Pork into Brandon's Meals*

Similarly, we hold that summary judgment in favor of Bedard with respect to the purposeful introduction of pork into Brandon's meals is also improper. A reasonable jury could find that intentionally placing pork in Brandon's meals would deter an inmate of ordinary firmness from continuing to grieve that violation. Certainly, there is no point to filing a grievance if the grievance results in more of the complained-of conduct. Therefore, under the second element of Brandon's retaliation claim, Bedard's alleged actions could reasonably be found to be adverse.

To show causation, Brandon again relies on temporal proximity, this time coupled with a comparison to the meals of other Muslim inmates. Brandon identifies several instances in which, after having filed numerous grievances in the days and weeks prior, he was served pork. For the reasons discussed above, due to the frequency with which Brandon filed grievances, this temporal proximity is of limited significance.

But there is other evidence supporting Brandon's claim that he was specifically targeted by Bedard. On at least three instances, Brandon avers that he received pork in a supposedly "meatless" meal. Although Clancy and Bedard claim that two of those instances were accidents, Brandon attests that he compared his meal with that of other Muslim inmates and found that his was the only meal with pieces of meat. He argues, plausibly, that this consistent difference in treatment supports his argument that the pork was placed in his meal intentionally. The matter is close. But we conclude that a reasonable jury could find that the temporal proximity and difference in treatment together are sufficient to support an inference of causation and retaliatory intent.

### 4. *Exposure to Assault*

Finally, we hold that Brandon has also introduced sufficient evidence to create a genuine dispute of material fact as to whether Clancy and Blaise retaliated against him by exposing him to assault by another inmate, Tiny.

Tiny spat on Brandon. This, while an assault, is not an especially egregious one. Nevertheless, Tiny was aggressive and had a history of physically attacking another inmate. When Clancy placed Tiny in the cell next to Brandon and Blaise subsequently instructed Brandon to pick up Tiny's tray, they exposed him to

45

potential assault. They could not have known beforehand whether Tiny would spit on Brandon or attack him physically in some more serious manner.

A reasonable jury could conclude that an inmate of ordinary firmness would be deterred from filing additional grievances if doing so would place him in harm's way and at the mercy of other inmates. We do not doubt that exposing a prisoner to potential assault by another inmate can constitute an adverse action, even if the actual resulting assault turns out to be relatively minor.

As to causation, Brandon's evidence again consists of a combination of temporal proximity and statements showing retaliatory animus. Here, the temporal proximity argument is even weaker than for the prior two claims. Brandon argues that he filed 26 grievances between September 15 and November 17, that Tiny was transferred to the cell next to his on November 17, and that Tiny spat on him on November 19. The 26 grievances Brandon cites, however, were more highly concentrated in September and October. For the reasons discussed above, the frequency of Brandon's grievances and their timing weaken the inference that can be drawn based on temporal proximity.

Brandon, however, also points to statements that he claims were made by Clancy and Blaise. And we conclude that these are sufficient to create a genuine

dispute of material fact as to retaliatory intent and causation. Brandon avers that, on October 17, a month before the assault, Clancy stated, "If he grieves another tray, I'm going to lock his ass up!" J.A. 36. Brandon further attests that, on November 17, when Clancy and Blaise transferred Tiny to his cell, Clancy said to Blaise, "[L]et's see if he tries that shit on Brandon!" J.A. 48. As for Blaise, Brandon claims that, after Tiny spat on him, Blaise laughed and said, "I can't believe he f***ing spit on you!" J.A. 48. When Brandon asked for a grievance, Blaise stated, "[G]ive me a break Brandon, you know you had that coming." J.A. 48-49.

Viewing the evidence in the light most favorable to Brandon, as we must do at summary judgment, we hold that a reasonable jury could find that the above evidence was sufficient to support an inference of causation.

## CONCLUSION

For the foregoing reasons, the district court's decision is **VACATED** in part and **AFFIRMED** in part. Specifically, we **VACATE** the district court's decision and **REMAND** for Brandon to proceed on his free exercise claim against Defendants Kinter, Bedard, Laurin, Clancy, Perry, and Webb and on his retaliation claim against Defendants Bedard, Kinter, and Laurin. And we **AFFIRM** the district court's decision dismissing the free exercise claim against Defendants Blaise and

47

Wingler and dismissing the retaliation claim against Defendants Webb, Wingler, and Perry.