21-533
*Wiggins v. Griffin, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2022

(Argued: January 6, 2023                    Decided: November 20, 2023)

Docket No. 21-533

_____

ROBERT E. WIGGINS,

*Plaintiff-Appellant*,

v.

THOMAS GRIFFIN, Superintendent, M. KOPP, Deputy Superintendent of Programs, D. HOWARD, Assistant Deputy Superintendent of Programs, and DR. G. JEBAMANI, Protestant Chaplain,

*Defendants-Appellees*.

_____

Before: KEARSE and MENASHI, *Circuit Judges*.[*]

_____

[*] Judge Rosemary S. Pooler, originally a member of the panel, died on August 9, 2023. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b); *United States v. Desimone*, 140 F.3d 457, 458-59 (2d Cir. 1998).

Robert E. Wiggins, a practicing Baptist, was incarcerated in the Green Haven Correctional Facility from 2002 until 2018. After prison officials failed to update the Protestant services "call-out list," Wiggins was excluded from all religious services for over five months. He sued Green Haven officials Thomas Griffin, M. Kopp, D. Howard, and Dr. G. Jebamani under 42 U.S.C. § 1983, alleging that they violated his constitutional rights. The United States District Court for the Southern District of New York (Philip M. Halpern, *J.*) granted the defendants' motion for summary judgment, reasoning that (1) the defendants did not substantially burden Wiggins's free exercise of religion, (2) the defendants were entitled to qualified immunity, and (3) if there were a constitutional violation, Kopp was not personally involved in it.

We affirm in part, vacate in part, and remand to the district court for further proceedings. First, we conclude that the defendants' failure to update the Protestant services call-out list, which prevented Wiggins from attending worship services for over five months, substantially burdened his religious exercise. Second, because disputed issues of material fact remain, qualified immunity cannot shield the defendants from liability at this juncture. Third, Wiggins sufficiently alleged Kopp's personal involvement in a First Amendment violation

by pleading that Kopp took no action even after she was informed that Wiggins's rights were being infringed. Finally, we hold that a Section 1983 free exercise claim requires a plaintiff to demonstrate the defendant's deliberate indifference to the plaintiff's rights. We remand to the district court to consider whether evidence of Kopp's, Howard's, and/or Jebamani's conduct suffices to permit a finding of deliberate indifference. But because Griffin is alleged to have engaged in (at most) an isolated act of negligence, we affirm the dismissal of the claim against him.

Judge Menashi concurs in a separate opinion.

—————————————

JENNIFER LOEB (Meredith Kotler, Andrew Henderson, and Matthew Steyl, *on the brief*), Freshfields Bruckhaus Deringer US LLP, New York, NY, *for Plaintiff-Appellant Robert E. Wiggins.*

ERIC DEL POZO, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Judith N. Vale, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, New York, NY, *for Defendants-Appellees Thomas Griffin, M. Kopp, D. Howard, and Dr. G. Jebamani.*

3

PER CURIAM:

Robert E. Wiggins, a practicing Baptist, was incarcerated in the Green Haven Correctional Facility ("Green Haven") from 2002 until 2018. When he arrived at Green Haven, he registered as a Baptist and was placed on the Protestant services "call-out list," enabling his regular attendance at the prison's weekend worship services and mid-week bible study. But after prison officials transferred Wiggins to a new cellblock, they failed to update the call-out list to reflect his relocation. Despite his repeated requests to update the call-out list with his name, Wiggins was deprived of all religious services for over five months before officials eventually reinstated him to the list.

Wiggins sued Green Haven officials Thomas Griffin, M. Kopp, D. Howard, and Dr. G. Jebamani (collectively, "Defendants") under 42 U.S.C. § 1983. He alleged that Defendants violated his First Amendment right to the free exercise of religion by failing to update the call-out list. The district court granted summary judgment to Defendants, reasoning that Wiggins's free exercise rights were not substantially burdened. Additionally, the district court concluded that Defendants

4

were shielded by qualified immunity and that Wiggins failed to plead Kopp's personal involvement in a First Amendment violation.

On appeal, Defendants concede that Wiggins's free exercise rights were substantially burdened. They nevertheless maintain that the judgment can be affirmed pursuant to the doctrine of qualified immunity. Alternatively, Defendants ask us to decide the requisite mental state for a Section 1983 free exercise claim and argue that negligence is insufficient. Wiggins, however, sees things differently. He points to disputed issues of material fact and evidence that suggest Defendants' deliberate indifference.

We affirm in part and vacate in part the district court's decision. We conclude that Wiggins's free exercise rights were substantially burdened, that disputed issues of material fact preclude Defendants from qualifying for immunity at this juncture, and that the record contains sufficient evidence to show that Kopp was informed of, but failed to take any action to remedy, the violation of Wiggins's rights that was within her sphere of responsibility. We also hold that Section 1983 free exercise claims require a showing of deliberate indifference, and

we remand to the district court to consider whether the conduct of Kopp, Howard, and/or Jebamani meets this standard. But because we find that Griffin engaged in (at most) an isolated act of negligence, we affirm the dismissal of the claim against him.

## BACKGROUND

### I.    Factual Background

The district court disposed of Wiggins's claims pursuant to a motion for summary judgment. Therefore, we recount the following evidence[2] in the light most favorable to Wiggins, drawing all available inferences in his favor. *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003).

Wiggins was incarcerated in Green Haven from 2002 until 2018. Green Haven follows New York State Department of Corrections and Community Supervision Directive 4202, governing the administration of religious programs in

---

[2] Wiggins's complaint was sworn under penalty of perjury, and we consider its factual assertions as evidence for summary judgment purposes. *Brandon v. Kinter*, 938 F.3d 21, 26 n.5 (2d Cir. 2019).

6

New York state prisons. Under this directive, in order to attend religious services, an incarcerated individual must register as an adherent of a particular faith and request to be placed on a "call-out list." Unlike other records maintained by Green Haven, religious call-out lists do not automatically change to reflect an inmate's transfer to a new prison location. Thus, when an individual is relocated to a different part of Green Haven, prison officials must manually update the list to reflect the transfer.

Wiggins was raised in the Baptist church and identifies himself as a Baptist or a Protestant. He attended church services throughout his life, which he views as a "fundamental act of worship." App'x at 16. At Green Haven, Wiggins registered as a Baptist and took part in Saturday and Sunday worship services "[e]very weekend, unless [he] was sick or [he] couldn't go," which "wasn't too often." App'x at 125. He also frequented Green Haven's mid-week bible study. Though 160 to 180 observers typically attend Sunday morning services, only 60 to 70 individuals participate in the other Protestant services offered at the prison.

7

On April 3, 2017, prison officials transferred Wiggins to a new cellblock. However, the call-out list was not updated to indicate his relocation. Initially, when officers told Wiggins that he was not on the new cellblock's call-out list, Wiggins assumed the list had not "c[aught] up" with his relocation. App'x at 454. But when Wiggins was not called for religious services again the following week, he asked the officers to put his name on the call-out list. He continued making these requests "every Saturday and Sunday." App'x at 14. The officers responded with "verbal[] threats" and "abusive language." App'x at 16-17.

As the weeks progressed, Wiggins pressed on. He sent several call-out requests to Jebamani, the Protestant chaplain "responsible for carrying out all aspects of . . . religious programs." App'x at 294. Wiggins also handed call-out requests to churchgoers, asking them to pass the notes to Jebamani. Jebamani did not respond to, and stated that he did not remember receiving, these requests. On May 2, 2017, Wiggins sent Jebamani a letter regarding the issue. Still, Jebamani did not respond. Then, on May 7, 2017, Wiggins wrote to Griffin, the Superintendent

at Green Haven. Wiggins implored Griffin to investigate his exclusion from the call-out list. Griffin did not respond.

Jebamani did not directly answer Wiggins. However, Jebamani stated that he contacted the Deputy Superintendent of Programs—either Kopp or Howard[3]—on June 5, 2017, requesting Wiggins's reinstatement to the call-out list. Jebamani stated that he sent another interdepartmental communication on July 25, 2017. His efforts were met with silence. Afterwards, Jebamani took no further action.

By September 2017, Wiggins remained unable to attend communal worship. He wrote again to Griffin on September 18, 2017, asserting that he was "being denied the right to attend religious services" and asking Griffin to address the matter. App'x at 342. Wiggins filed a formal complaint with the Inmate Grievance Resolution Committee that same day. This time, Griffin's office forwarded

---

[3] The record reflects some confusion among Defendants as to who was the "Deputy Superintendent of Programs." In her affidavit, Kopp identified herself as Deputy Superintendent for Programs. In response to Wiggins's interrogatories, Howard also listed himself as Deputy Superintendent of Programs. In other documents, however, Howard stated that he was Assistant Deputy of Programs or Assistant Deputy Superintendent for Program Services.

Wiggins's letter to Howard as Assistant Deputy of Programs, who updated the call-out list on September 20, 2017. Wiggins was eventually able to attend worship services on September 23.

## II. Procedural History

Wiggins instituted this pro se action on August 16, 2018. He alleged that Defendants violated his First and Fourteenth Amendment rights by failing to update the call-out list.[4]

On February 22, 2021, the district court granted Defendants' motion for summary judgment, dismissing the case. In its decision, the district court determined that Wiggins's exclusion from communal worship did not constitute a substantial burden on his religious beliefs because he "occasionally missed religious services" while imprisoned. *Wiggins v. Griffin*, No. 18-CV-07559, 2021 WL 706720, at *4 (S.D.N.Y. Feb. 22, 2021). It highlighted Wiggins's decision to wait five

---

[4] Wiggins abandoned his Fourteenth Amendment claim on appeal.

months before filing a formal complaint and concluded on that basis that Wiggins "was not that concerned about the issue." *Id.*

The district court provided alternative bases for its decision. First, the district court held that Defendants were shielded from liability under the doctrine of qualified immunity. It determined that Wiggins did not have a "clearly established right to attend religious services despite the fact that his name did not appear on a call-out list." *Id.* at *6. And because Defendants eventually remedied the situation, the district court concluded that each defendant was neither "plainly incompetent [n]or in knowing violation of the law." *Id.* Second, the district court dismissed claims against Kopp on the ground that Wiggins's complaint did "not include any allegations" against her. *Id.* at *5 n.5.

Wiggins timely appealed.

## DISCUSSION

We review de novo the district court's grant of summary judgment. *See Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Summary judgment is appropriate when, viewing the evidence favorably to the non-movant, there is no genuine issue

11

of material fact and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). "A genuine issue exists— and summary judgment is therefore improper—where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Brandon*, 938 F.3d at 31 (internal quotation marks omitted). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## I.    Substantial Burden

We begin our discussion with the continued vitality of the substantial burden test. The Free Exercise Clause of the First Amendment safeguards religious practice, providing that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. Incarcerated individuals "retain some measure of th[is] constitutional protection." *Ford*, 352 F.3d at 588. Seeking to balance the rights of incarcerated persons with the "interests of prison officials" in

performing their complex duties in administering the penal system, we have required a threshold showing that a prison official's conduct "substantially burdens" an incarcerated individual's "sincerely held religious belief." *Brandon*, 938 F.3d at 32 (internal quotation marks omitted). Even if this burden is met, a defendant may still avoid liability by showing the conduct at issue was "reasonably related to legitimate penological interests." *See Holland v. Goord*, 758 F.3d 215, 222 (2d Cir. 2014) (internal quotation marks omitted).

A burden on religious exercise is not substantial when it "comfortably could be said that a belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis." *Ford*, 352 F.3d at 593. We have explained, however, that preventing an incarcerated person from attending communal religious services without justification cannot be described as constitutionally de minimis. *See Sabir v. Williams*, 52 F.4th 51, 65 n.9 (2d Cir. 2022) ("[P]reventing a prisoner from engaging in congregational prayer constitutes a substantial burden on the prisoner's religious exercise.").

13

We have not decided whether the substantial burden test survives *Employment Division v. Smith*, 494 U.S. 872 (1990). *See Holland*, 758 F.3d at 220; *Brandon*, 938 F.3d at 32 n.7. In *Smith*, the Supreme Court held that an alleged free exercise violation stemming from a facially neutral law of general applicability could not be evaluated under a balancing test. 494 U.S. at 884-85. It also "took issue with the premise that courts can differentiate between substantial and insubstantial burdens." *Ford*, 352 F.3d at 592 (describing *Smith*). Wiggins thus asserts that the substantial burden test has no continued place in our jurisprudence because it seeks to "determine the place of a particular belief in a religion"—in direct contravention of *Smith*. Appellant's Br. at 23 (quoting *Smith*, 494 U.S. at 887). Indeed, our sister circuits disagree about whether the sun has set on this test. *Brandon*, 938 F.3d at 32 n.7 (collecting cases). But we need not answer the question here because Defendants concede that the burden on Wiggins's rights was substantial. *See* Appellee's Br. at 39.

It is undisputed that the call-out list was not timely updated, without justification. Because of this unjustified delay, Wiggins was unable to engage in a

14

"fundamental act of worship" for over five months. App'x at 16. As Defendants now concede, this amounted to a substantial burden on Wiggins's free exercise rights. *See* Appellee's Br. at 39 ("Wiggins'[s] sincerely held religious beliefs were substantially burdened by his allegedly months-long inability to attend congregate prayer services."); *see also Sabir*, 52 F.4th at 65 n.9.

We note several problematic inferences reached by the district court in its conclusion that Wiggins suffered no substantial burden. The district court reasoned that Wiggins was never forced "to modify his behavior or violate his beliefs" because he "occasionally missed religious services." *Wiggins*, 2021 WL 706720, at *4. But Wiggins testified that between 2002 and 2017 he attended congregational services "[e]very weekend" except when he "couldn't go" because he was sick or had a visit, which "wasn't too often." App'x at 125. We have never construed the substantial burden test so narrowly as to suggest that an individual's intermittent absences, in the context of a lifetime of worship, indicates the unimportance of the religious practice. *See Brandon*, 938 F.3d at 32 ("[E]stablishing a substantial burden is not a particularly onerous task." (internal

15

quotation marks omitted)). Moreover, there is no indication that Wiggins had ever abstained from worship services for months-long periods, indicating that inaction by one or more Defendants did, in fact, force Wiggins to modify his behavior and violate his beliefs. *See Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (explaining that "a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs" even for "only a short period of time" (internal quotation marks omitted)).

The district court also posited that Wiggins "was not that concerned about the issue" because he failed to file a formal grievance for several months. *Wiggins*, 2021 WL 706720, at *4. This inference ignores that Wiggins twice a week requested that the call-out list be updated, passed notes about the issue to Jebamani, and sent letters to both Griffin and Jebamani. We reiterate the danger of making "conclusory judgments about the unimportance of the religious practice to the adherent," *Ford*, 352 F.3d at 593, especially when there is evidence to the contrary.

At bottom, because there is evidence from which a jury could find that the conduct of one or more Defendants placed a substantial burden on Wiggins's

16

religious exercise, we avoid the question of whether the substantial burden requirement survives *Smith*. *See Holland*, 758 F.3d at 220-21 (declining to address the "continued vitality of the substantial burden requirement" when the plaintiff's religious exercise was substantially burdened). And because Defendants concede that Wiggins's rights were substantially burdened, summary judgment on this basis was improper.

## II.     Qualified Immunity

We next turn to the doctrine of qualified immunity. The district court concluded that Wiggins did not have the "right to attend religious services despite the fact that his name did not appear on a call-out list." *Wiggins*, 2021 WL 706720, at *6. Wiggins argues that this inaccurately captures the scope of his right. On appeal, Defendants abandon the district court's framing, instead asserting that Wiggins did not have a clearly established right to a "call-out system that automatically updates." Appellee's Br. at 35.

Qualified immunity is meant to "provide[] ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475

17

U.S. 335, 341 (1986). The doctrine shelters a defendant whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brandon*, 938 F.3d at 39 (internal quotation marks omitted). We find a right clearly established when "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (internal quotation marks and alterations omitted). Even when we find a right clearly established, defendants "may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (internal quotation marks omitted).

We acknowledge that defining a right at the appropriate level of generality is not always straightforward. *Id.* (observing that "accurately defining the right at issue" is a "chronic difficulty . . . for courts"). This is apparent when, as in this case, the parties and the district court each articulate a different right at stake. The

18

Supreme Court has cautioned that a broadly defined right creates "virtually unqualified liability," *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), yet we have also recognized that a too-narrowly defined right "effectively insulate[s] the government's actions," *LaBounty*, 137 F.3d at 73.

The district court erred in defining Wiggins's right as the "right to attend religious services despite the fact that his name did not appear on a call-out list." *Wiggins*, 2021 WL 706720, at *6. Not only is this characterization of the right at issue too narrow; it ignores the substance of Wiggins's pleas. Wiggins did not challenge the prison's use of a call-out list generally. Rather, he contested Defendants' inaction in response to his requests to be reinstated on such list. Nevertheless, Defendants argue that an incarcerated individual does not have a clearly established right to a "call-out system that automatically updates." Appellee's Br. at 35. We have never found such a narrowly construed right.

We have, however, held that incarcerated individuals have the right to engage in religious exercise absent a legitimate penological justification for the denial. *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) ("Summary

19

judgment on the basis of qualified immunity is not appropriate because it was clearly established law at the time of the alleged violations that religious exercise may not be denied without any reason."). The failure of prison administrators to update the call-out list violated this clearly established right.

Whether any of the Defendants are liable for the violation of this clearly established right depends on the resolution of competing narratives. The record indicates that Jebamani failed to act on Wiggins's requests for over a month. Jebamani asserts that in June and again in July he finally sent interdepartmental communications to either Kopp or Howard as the Deputy Superintendent of Programs. But the Deputy did not process the requests, and Kopp and Howard both deny knowledge of the requests. Moreover, when Kopp or Howard failed to act, Jebamani took no further action. All the while, Jebamani, Kopp, and Howard were aware that the call-out list was not automatically updated. In other words, if they knew of Wiggins's requests, they would have known that Wiggins's ability to attend religious services depended on their input.

20

On the issue of whether Kopp or Howard was aware of Wiggins's requests, depending on whose testimony we credit, there are at least three versions of events: that Jebamani sent the communications to Kopp but not Howard; that Jebamani sent the communications to Howard but not Kopp; or that Jebamani sent the communications to neither of them. It is thus possible for a jury to conclude that fewer than all Defendants are liable—if, for example, it finds that Kopp but not Howard received Jebamani's communications.

However, it is not the court's role on summary judgment to make "[a]ssessments of credibility and choices between conflicting versions of the events." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (internal quotation marks omitted); *see also Reeves*, 530 U.S. at 151 (stating that on summary judgment a court "must disregard all evidence favorable to the moving party that the jury is not required to believe"). Rather, we draw factual inferences in Wiggins's favor with respect to his claim against each Defendant separately. In considering Wiggins's claim against Jebamani, we adopt the inference that Jebamani never sent the communications to the Deputy—thereby crediting Kopp's

21

and Howard's assertions[5]—or otherwise failed adequately to respond to Wiggins's repeated requests. In considering Wiggins's claim against Kopp, we adopt the inference that Kopp received Jebamani's communications—thereby crediting Jebamani's assertion that he sent the communications and Howard's assertion that they were not directed to him. And in considering Wiggins's claim against Howard, we adopt the inference that Howard received Jebamani's communications—thereby crediting Jebamani's assertion that he sent the communications and Kopp's assertion that they were not directed to her.

---

[5] The record contains documents which Jebamani asserts are the June 5, 2017 and July 25, 2017 communications sent from him to the Deputy Superintendent of Programs relaying Wiggins's call-out list requests. *See* App'x at 359-60. These documents appear to be from Jebamani's records, so we cannot tell whether they were actually sent to or received by the Deputy. Furthermore, the document showing Jebamani's July 25 communication—unlike the June 5 document—is not on Department of Corrections and Community Supervision letterhead, has no "To" or "From" lines, and at the top of the page has only a handwritten date of July 25, 2017. App'x at 360.

In short, a jury may find that one or more Defendants[6] purposefully ignored or delayed processing Wiggins's requests, seeking to deny his participation in communal worship, or may have been deliberately indifferent to Wiggins's requests. In such a scenario, they would have violated Wiggins's clearly established right. *See Sabir*, 52 F.4th at 64-65. Furthermore, because Defendants acknowledged that the call-out system required their input, they could not escape liability by arguing that "reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *See LaBounty*, 137 F.3d at 73 (internal quotation marks omitted). But, on the other hand, a Defendant may have simply missed Wiggins's requests or failed to take extra steps to ensure they were processed. If so, qualified immunity may be appropriate.

---

[6] Because we affirm the judgment as to Griffin, we do not address whether qualified immunity would have shielded his conduct.

Because the record contains evidence to support the conflicting accounts, the question is one for the jury. *See Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006). Jebamani, Kopp, and Howard are not entitled to qualified immunity at this stage.

## III.    Personal Involvement

We also consider the district court's dismissal of claims against Kopp because Wiggins's complaint "d[id] not include any allegations against" her. *Wiggins*, 2021 WL 706720, at *5 n.5. Wiggins maintains that he sufficiently alleged Kopp's personal involvement.

To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). We liberally construe submissions from pro se plaintiffs,[7] interpreting them to make "the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis omitted).

---

[7] Although Wiggins is represented by counsel on appeal, he was pro se before the district court.

24

In his complaint, Wiggins alleged that Kopp was the Deputy Superintendent of Programs at Green Haven and was "responsible for [the prison's] day-to-day activities and the involvement of the Facility Chaplains and their approved religious programs and services call-outs." App'x at 13. He averred that Kopp had "actual and constructive notice" of the "on[]going denial of [his] right to attend religious services." App'x at 17. And he complained that Kopp's "inaction[]" caused a violation of his free exercise rights. App'x at 17. Construing Wiggins's complaint liberally, as we must, we conclude that he sufficiently alleged Kopp's personal involvement in a First Amendment violation. *See Triestman*, 470 F.3d at 474.

This conclusion has support in the record before us. The evidence suggests—albeit not unequivocally, *see supra* note 3—that Kopp was the Deputy Superintendent of Programs, and Jebamani stated that he sent two requests to the Deputy Superintendent of Programs that asked for Wiggins's reinstatement to the call-out list. The record also supports the inference that the Deputy Superintendent of Programs failed to act upon these requests. Although Kopp denied any personal

25

involvement in the circumstances underlying Wiggins's claim, the record reflects a genuine dispute as to whether her inaction substantially burdened Wiggins's free exercise rights.[8] As such, we vacate the district court's grant of summary judgment as to Kopp.

## IV.  Mental State

Finally, we address Defendants' states of mind in failing to reinstate Wiggins to the call-out list. The parties disagree as to the relevant standard and whether this standard was met. Defendants argue that a Section 1983 free exercise claim requires proof that an official acted intentionally or with deliberate indifference to a plaintiff's rights and that the record demonstrates nothing more than negligence. Meanwhile, Wiggins asserts that we have never held negligence

---

[8] Because we affirm the judgment as to Griffin, we do not reach Defendants' argument that the record does not reflect Griffin's personal involvement in Wiggins's First Amendment claim.

insufficient to sustain such a claim and that, nevertheless, the record supports the inference that Defendants acted with deliberate indifference.

Section 1983 does not include a state-of-mind requirement. *See* 42 U.S.C. § 1983; *Daniels v. Williams*, 474 U.S. 327, 329-30 (1986). Instead, this requirement is defined by the underlying constitutional right at stake. *Id.* at 330. We have not clarified the minimum standard for a Section 1983 free exercise claim, *see Brandon*, 938 F.3d at 38, but our sister circuits considering this issue have concluded that negligent conduct is not enough. *Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006) ("We . . . hold that negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause."); *Eason v. Thaler*, 73 F.3d 1322, 1327 n.2. (5th Cir. 1996) (concluding that a prison official's negligent act of designating the wrong religion on a travel card could not amount to a First Amendment violation); *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1055 (8th Cir. 2020) ("[E]vidence that a correction official negligently failed to comply with an inmate's sincerely held religious dietary beliefs does not establish a Free Exercise Clause claim under § 1983."); *Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009)

27

("[I]solated act[s] of negligence would not violate an inmate's First Amendment right to free exercise of religion.").

We now join those circuits. Negligence is the "failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." *Negligence*, Black's Law Dictionary (11th ed. 2019). The First Amendment's command that government not "prohibit" the free exercise of religion, U.S. Const. amend. I, "connotes a conscious act, rather than a merely negligent one," *Lovelace*, 472 F.3d at 201 (internal quotation marks omitted); *accord Prohibit*, Black's Law Dictionary (11th ed. 2019) (defining prohibit as to "prevent, preclude, or severely hinder"). Given this understanding of the First Amendment, isolated acts of negligence cannot violate an individual's free exercise of religion in this context. *See Daniel*, 474 U.S. at 330.

Although mere negligence cannot support a First Amendment free exercise claim, we have previously held that deliberate indifference "clearly suffices." *Brandon*, 938 F.3d at 38 (citing *Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Wash. Indus. Dev. Agency*, 77 F.3d 26 (2d Cir. 1996)). Deliberate indifference arises

28

when an actor is "culpabl[y] reckless[]," or when an official's "act or . . . failure to act" reveals "a conscious disregard of a substantial risk of serious harm." *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) (internal quotation marks omitted). Repeated acts of apparent negligence may indicate deliberate indifference. *See Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977) ("[W]hile a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures.").

With these principles to guide us, we affirm the district court's dismissal of the claim against Griffin. Wiggins sent Griffin two letters. Although Griffin left one letter unanswered, he quickly acted upon the second. Construing this evidence favorably to Wiggins, it establishes (at most) that Griffin acted negligently in response to the first letter. Such a showing is insufficient.

Whether the record suffices to permit a finding that any of the remaining defendants were deliberately indifferent poses a closer question. Instead of single

29

acts of negligence, the record contains sufficient evidence to allow a jury to conclude that one or more of the remaining defendants repeatedly failed to redress Wiggins's exclusion from the call-out list. Jebamani testified that he sent two interdepartmental communications to the Deputy Superintendent of Programs. But he took no further action when Wiggins did not return to worship services or bible study. Jebamani asserted that it was "not possible to keep up with when an inmate ha[d] not been to services" because of the number of adherents and "irregular . . . attendance." App'x at 309. It is conceivable, however, that Jebamani should have noticed that Wiggins—a regular worshiper of many years—was missing week after week from services consisting of only 60 to 180 people. Thus, a jury could rationally conclude that Jebamani's repeated failure to rectify the situation constituted more than negligence. Furthermore, if the jury finds that Jebamani, as he claims, sent the Deputy Superintendent requests in June and July to reinstate Wiggins to the call-out list, it could find that the failure to act by whoever was Deputy (whether Kopp or Howard) was more than negligent. Although Defendants contend that Wiggins should have done more to follow up,

30

Kopp or Howard may have nevertheless failed to act on repeated requests despite their knowledge that the call-out system required their manual input.

The district court did not consider whether this evidence sufficed to support a finding of deliberate indifference. Rather, it concluded that Defendants "had [no] reason to know that their conduct" burdened Wiggins's rights because they eventually placed Wiggins back on the call-out list. *Wiggins*, 2021 WL 706720, at *5. This conclusion impermissibly views the record in a light less than "most favorable" to Wiggins, *see Tolan v. Cotton*, 572 U.S. 650, 657 (2014), giving disproportionate weight to Defendants' late-stage remedial actions. We thus vacate the judgment in part and remand to the district court to consider whether the record—viewed favorably to Wiggins with respect to each claim—reflects a dispute as to Jebamani's, Kopp's, and Howard's deliberate indifference. *See Florez v. Cent. Intel. Agency*, 829 F.3d 178, 189 (2d Cir. 2016) ("[R]emanding the case is in keeping with our general policy that the trial court should consider arguments . . . in the first instance.").

## CONCLUSION

Defendants contend that their failures boil down to "less than perfect prison administration." Oral Argument Audio Recording at 41:32-41:35. The question to be determined, however, is whether the conduct of Jebamani, Kopp, and/or Howard constituted deliberate indifference to Wiggins's First Amendment rights. For the reasons above, we affirm in part, vacate in part, and remand to the district court for further proceedings consistent with this opinion: We affirm the dismissal of the claim against Griffin, and vacate and remand the dismissal of the claims against Jebamani, Kopp, and Howard.

M<small>ENASHI</small>, *Circuit Judge*, concurring:

I join the court's opinion, which correctly holds that negligent conduct by an official is insufficient to establish a violation of the Free Exercise Clause under 42 U.S.C. § 1983. *Ante* at 28. Wiggins's claim against Griffin cannot succeed because, as the court explains, Griffin at most acted negligently in response to Wiggins's letter. *Id.* at 29. But a reasonable jury could conclude on this record that the remaining defendants were deliberately indifferent.

I also agree that the complaint sufficiently alleges Kopp's personal involvement, *id.* at 25, and that the district court erred when it determined that qualified immunity protected the defendants' conduct. The district court identified the right at issue as Wiggins's purported right to "attend religious services despite the fact that his name did not appear on a call-out list." *Wiggins v. Griffin*, No. 18-CV-07559, 2021 WL 706720, at *6 (S.D.N.Y. Feb. 22, 2021). That description "[c]haracteriz[ed] the right too narrowly to the facts of the case" and thereby risked "permit[ting] government actors to escape personal liability." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir. 2001). Because of the defendants' conduct, Wiggins "was excluded from religious services without reason," and such exclusion implicates a clearly established right. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). For these reasons, the court properly affirms the judgment as to Griffin but allows the claims against the remaining defendants to proceed.

I write separately to address the open question of whether a prisoner must show a substantial burden on his religious exercise to state a claim under § 1983 for a violation of the Free Exercise Clause. Since *Employment Division v. Smith*, 494 U.S. 872 (1990), the circuits

have split on that question.[1] "Whenever the question has arisen in our Circuit," however, we have avoided taking a position by observing "either that the parties did not brief the issue or that the requirement, even if applied, would have been satisfied." *Brandon v. Kinter*, 938 F.3d 21, 32 n.7 (2d Cir. 2019).[2] In light of that avoidance, the "[d]istrict

---

[1] *Compare Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003) ("The Prison Officials argue that it is also a prerequisite for the inmate to establish that the challenged prison policy 'substantially burdens' his or her religious beliefs. There is no support for that assertion.") (citation omitted); *Butts v. Martin*, 877 F.3d 571, 585-86 (5th Cir. 2017) ("Other circuits have required that a prisoner must make a threshold showing that a regulation imposes a substantial burden on their religious exercise in order to maintain free exercise claims. … [T]his Court has not required a preliminary showing that a regulation substantially interferes with an inmate's religious rights before assessing whether the regulation is reasonably related to a penological interest."); *Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) ("Given the Supreme Court's disapproval of the centrality test, we are satisfied that the sincerity test … determines whether the Free Exercise Clause applies."), *with Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017) ("In order to state a claim for violation of rights secured by the Free Exercise Clause, an inmate, as a threshold matter, must demonstrate that … a prison practice or policy places a substantial burden on his ability to practice his religion."); *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1053 (8th Cir. 2020) ("[T]he inmate must show the challenged regulation 'substantially burdens' his sincerely held belief."); *Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021) ("To state a valid constitutional claim, a prisoner must allege facts showing that officials substantially burdened a sincerely held religious belief."); *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002) ("[T]he First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice.").

[2] *See also ante* at 14 ("[W]e need not answer the question here because Defendants concede that the burden on Wiggins's rights was substantial."); *Ford v. McGinnis*, 352 F.3d 582, 592 (2d Cir. 2003) ("[W]e … proceed in this appeal on the assumption that the substantial burden test applies.");

courts within this circuit continue to apply the substantial burden test when addressing free exercise claims." *Nicholson v. Ferreira*, No. 20-CV-1214, 2021 WL 327529, at \*5 n.3 (D. Conn. Feb. 1, 2021). And the district court dismissed Wiggins's claims in this case based on the substantial burden test. *See Wiggins*, 2021 WL 706720, at \*4.

We have explained that "the substantial burden test requires courts to distinguish important from unimportant religious beliefs" because it assumes that burdens on beliefs that are "peripheral to the plaintiff's religion … can be aptly characterized as constitutionally de minimis." *Ford*, 352 F.3d at 593. The substantial burden test, however, is constitutionally offensive. It conflicts with the reasoning of all three opinions in *Smith*. *See* 494 U.S. at 887 ("Judging the centrality of different religious practices is akin to the unacceptable business of evaluating the relative merits of differing religious claims.") (internal quotation marks omitted); *id*. at 906-07 (O'Connor, J., concurring in the judgment) ("[O]ur determination of the constitutionality of Oregon's general criminal prohibition cannot, and should not, turn on the centrality of the particular religious practice at issue."); *id.* at 919 (Blackmun, J., dissenting) ("[C]ourts should refrain from delving into questions whether, as a matter of religious doctrine, a particular practice is 'central' to the religion."). It is incompatible with recent Supreme Court cases that rely on sincerity as the threshold inquiry for free exercise claims. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022) ("[A] plaintiff may carry the burden of

---

*Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.") (internal quotation marks omitted).

proving a free exercise violation … by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'") (quoting *Smith*, 494 U.S. at 879-81). And it cannot be reconciled with the "well established" principle, "in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion); *see Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").[3]

In an appropriate case, we should hold that a prisoner alleging a violation of the Free Exercise Clause under § 1983 need only show a burden on sincerely held religious beliefs—not a "substantial" burden that involves showing that the beliefs are "central." Three decades is too long for federal judges to be telling litigants which of their religious beliefs are "unimportant." *Ford*, 352 F.3d at 593.

---

[3] *See also* Michael A. Helfand, *Identifying Substantial Burdens*, 2016 U. Ill. L. Rev. 1771, 1774 ("[T]he Establishment Clause is typically understood to prohibit courts from investigating matters of religion and theology; so evaluating the theological substantiality of a law's burden on a person's religious exercise would seem to be off limits.").