22-2813-cv
*Baltas v. Chapdelaine*

# United States Court of Appeals
# For the Second Circuit

August Term 2024
Argued:  January 31, 2025
Decided:  September 3, 2025

No. 22-2813-cv

JOE BALTAS, JASON GOODE, KENYON L. JOSEPH PELLOT-CASTELLANO,
RICHARD RICE, YARDLEY DAVIS, PHILIP RIVERA, NOAH GLADDING,
PETER TARASCO, JOSE ORTIZ,

*Plaintiffs-Appellants,*

*v.*

CAROL CHAPDELAINE, GIULIANNA MUDANO, AND ANGEL QUIROS,

*Defendants-Appellees.*[*]

On Appeal from the United States District Court
for the District of Connecticut
No. 17-cv-242
Robert N. Chatigny, *Judge.*
Michael P. Shea, *Chief Judge.*

---

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

Before:        CARNEY, PARK, and NARDINI, *Circuit Judge*s.

Nine Connecticut inmates claim that their confinement in a special housing unit called Q-Pod violated their constitutional rights. They sued prison officials under 42 U.S.C. § 1983, alleging violations of their First, Eighth, and Fourteenth Amendment rights. The district court (Chatigny, *J.*) granted Defendants' motion for summary judgment on qualified-immunity grounds.

We affirm as to Plaintiffs' Eighth Amendment and procedural due process claims, as well as the free exercise claims of seven of the nine Plaintiffs. But we reverse as to two Plaintiffs' free exercise claims alleging that Defendants denied their requests to participate in Native American sweat lodge and smudging practices, which are congregate religious services. Defendants offered no penological justification for the denials—not to Plaintiffs, the district court, or this Court—so their refusal to permit participation in religious congregation violated clearly established law. The judgment and order of the district court are **AFFIRMED** in part and **REVERSED** in part and the case is **REMANDED** with instructions to deny Defendants' motion as to Joe Baltas's and Joseph Tarasco's denial-of-congregation claims. We also **VACATE** the dismissal of Baltas's and Tarasco's state-law claims.

––––––––

JAMES DURLING, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC; William B. Michael, Andrew Fishman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Plaintiffs-Appellants*.

2

ZENOBIA GRAHAM-DAYS, Assistant Attorney General, *for* William Tong, Attorney General of Connecticut, Hartford, CT, *for Defendants-Appellees*.

————

PARK, *Circuit Judge*:

Nine Connecticut inmates claim that their confinement in a special housing unit called Q-Pod violated their constitutional rights. They sued prison officials under 42 U.S.C. § 1983, alleging violations of their First, Eighth, and Fourteenth Amendment rights. The district court (Chatigny, *J.*) granted Defendants' motion for summary judgment on qualified-immunity grounds.

We affirm as to Plaintiffs' Eighth Amendment and procedural due process claims, as well as the free exercise claims of seven of the nine Plaintiffs. But we reverse as to two Plaintiffs' free exercise claims alleging that Defendants denied their requests to participate in Native American sweat lodge and smudging practices, which are congregate religious services. Defendants offered no penological justification for the denials—not to Plaintiffs, the district court, or this Court—so their refusal to permit participation in religious congregation violated clearly established law. The judgment and order of the district court are affirmed in part and reversed in part and the case is remanded with instructions to deny Defendants' motion as to Joe Baltas's and Joseph Tarasco's denial-of-congregation claims. We also vacate the dismissal of Baltas's and Tarasco's state-law claims.

3

## I. BACKGROUND

A.      Factual Background[1]

Plaintiffs-Appellants are nine current or former inmates in Connecticut's MacDougall-Walker Correctional Institution who were detained in the prison's "Q-Pod" housing unit between 2009 and 2016.  Q-Pod, which is separate from the prison's main building, has 60 cells with two bunks each.  It is "used to house inmates who are transitioning from more restrictive conditions of confinement, such as punitive segregation, back to general population."  Special App'x at 4.  Although Department of Corrections ("DOC") regulations consider Q-Pod a "reclassification unit," Plaintiffs claim that it is a "punitive unit" with more severe conditions than the prison's general-population wings.  Joint App'x at 300.

Defendants-Appellees are Carol Chapdelaine, the prison warden, Giulianna Mudano, the deputy warden, and Angel Quiros, the district administrator at the time of the alleged confinement.

When a MacDougall-Walker inmate violates the Code of Penal Discipline, he receives a "ticket" and time in the prison's Restrictive Housing Unit ("RHU").  The prison's Inmate Handbook provides that "[u]pon release from RHU and upon having been found guilty or having pled guilty to a charge(s) under the Code of Penal Discipline, inmates . . . will complete the remainder of their time on Unassigned Status in" Q-Pod.  Joint App'x at 95-96.  The Handbook specifies that inmates will stay in Q-Pod for 90 days for more severe infractions

_____

[1] The facts as set forth here are drawn from the record at summary judgment and are not disputed except as noted.

4

(Class A tickets) or 60 days for others (Class B tickets). Despite these guidelines, Plaintiffs assert that they were often kept in Q-Pod for five months or longer, with the longest specific allegation being nine consecutive months in Q-Pod.

Plaintiffs also complain about five conditions of confinement in Q-Pod. First, they claim to have faced significant isolation in Q-Pod. Plaintiffs spent 22 out of 24 hours per day in their cells. During the other two hours, Q-Pod inmates had access to an outdoor yard with a basketball court. They were also permitted daily visitation. By comparison, general-population inmates had three hours of recreation. Although Q-Pod inmates generally had cellmates, Plaintiffs allege that some were alone in their cells.

Second, Plaintiffs allege that their Q-Pod cells were unsanitary. In particular, Q-Pod "had restrictions on flushing the toilet a certain number of times in a given period, causing the toilets to be turned off for two to three hours at a time." Appellants' Br. at 6. The parties dispute the intervals on these timers, but Q-Pod inmates are advised that they can flush the toilet two times in five minutes and then must wait five minutes before flushing again; otherwise, attempting a third flush within 10 minutes will lock the toilet for 30 minutes. Defendants claim that other MacDougall-Walker units have these timers as part of a municipal water-use agreement, but Plaintiffs deny this and also claim that Q-Pod officers shut off Q-Pod inmates' water for hours at a time.

Third, Plaintiffs claim that Q-Pod officers deprived them of medical care and drug and alcohol counseling. Although there is a medical room in Q-Pod, Plaintiffs contend that they "would be denied

medical treatment," Joint App'x at 303, but none alleges a specific instance of being denied care. Plaintiffs further claim that there was no drug and alcohol counseling in Q-Pod.

Fourth, Plaintiffs claim that Q-Pod lacked vocational training, job assignments, and education. The parties agree that these opportunities are privileges that may be restricted as part of the disciplinary process. And Plaintiffs do not challenge the disciplinary process that resulted in their confinement in the RHU, but contend that their privileges should not be restricted in Q-Pod because it is an "arbitrary and capricious" sanction.

Fifth, Plaintiffs say that Q-Pod offered limited religious services. Seven Plaintiffs claim at most that Q-Pod had "[s]egregated & restricted religious services (if any at all)." *See, e.g.*, Joint App'x at 122. But they fail to allege that they have sincerely held religious beliefs, that they sought out religious services to exercise those beliefs, or that Defendants denied any requests for such services.

Two Plaintiffs, however, claim that Q-Pod officials denied their requests for Native American services. Baltas and Tarasco say they requested but were denied access to "smudging," a Native American ceremony involving burning grasses and tobacco led by an elder or spiritual leader. Prison officials denied Baltas's grievance about smudging, noting that "inmates in Q-unit do not smudge with [the general] population. They are allowed to dry smudge in their cells until they move to another unit. The Native American Chapl[a]in does a service with the inmates in Q unit." Joint App'x at 78. Tarasco says he too was barred from smudging, as well as sweat-lodge services, which involve group prayer in a special sauna at

6

MacDougall-Walker. His former cellmate attests that Tarasco asked a Native American Services Alder and a Q-Pod counselor about access to those services. The counselor told Tarasco that the wardens were aware of his request but might not be able to provide the services due to staffing issues.

B.    Procedural History

Plaintiffs sued on February 15, 2017, seeking damages and injunctive relief under 42 U.S.C. § 1983 and Connecticut state law. As relevant here, Plaintiffs claimed that Defendants violated (1) the Eighth Amendment right to be free from cruel and unusual punishment; (2) the Fourteenth Amendment right to due process of law; (3) the First Amendment right to free exercise of religion; and (4) the Connecticut Constitution. Defendants denied Plaintiffs' allegations and asserted qualified immunity.

The district court granted Defendants' motion for summary judgment on qualified-immunity grounds on all federal claims, declined to exercise supplemental jurisdiction over the state-law claims, and denied Plaintiffs' requests for injunctive relief as moot. As to Plaintiffs' Eighth Amendment claims, the district court concluded that Q-Pod "did not impose a level of isolation sufficient to support a constitutional claim." Special App'x at 12. It also held that Plaintiffs' claims regarding toilet-flush restrictions fail because "[t]emporary deprivations of toilet use that do not result in serious physical harm or contamination do not rise to the level of a constitutional violation." *Id.* at 14. The district court concluded that, in any event, Defendants are entitled to qualified immunity because "Plaintiffs have not identified relevant case authority showing that

7

the restrictive conditions they experienced in Q-Pod violated the Eighth Amendment." *Id.* at 16.

The district court also rejected Plaintiffs' procedural due process claims. First, the record was "insufficient to permit a reasoned determination of whether plaintiffs can prove a state-created liberty interest." Special App'x at 18. Even assuming such an interest, the district court concluded that "the conditions in Q-Pod were not dramatically different from the conditions in general population." *Id.* at 19. Although Baltas and Tarasco had raised a triable issue as to the deprivation of their religious services, the district court concluded that Defendants were entitled to qualified immunity because "Plaintiffs cite no relevant case authority clearly establishing that confining them in Q-Pod without procedural safeguards for the periods at issue violated the Fourteenth Amendment." *Id.* at 25.

Finally, the district court concluded that Defendants were entitled to qualified immunity from Plaintiffs' free exercise claims. The court found that Baltas and Tarasco—but not the other Plaintiffs—might "be able to prove that they were deprived of a constitutional right to participate in congregate religious services." Special App'x at 30 (cleaned up). But Defendants were immune because "[n]o relevant case authority has been cited or found that addresses the First Amendment free exercise rights of inmates to participate in sweat lodge or smudging services." *Id.* at 32.

Plaintiffs moved for reconsideration. The case was subsequently reassigned and the district court (Shea, *C.J.*) denied that motion on June 5, 2023. Plaintiffs timely appealed the grant of

8

summary judgment. We granted leave to proceed in forma pauperis and appointed counsel from our pro bono panel.[2]

## II. DISCUSSION

Plaintiffs argue that Defendants are not entitled to qualified immunity because they violated clearly established law. We disagree as to the Eighth Amendment and due process claims and affirm Defendants' qualified immunity on those claims. As for the First Amendment claims, we also affirm the district court's judgment for Defendants on qualified immunity grounds, except we reverse and remand as to two Plaintiffs' denial-of-congregation claims.

A.   Legal Standards

"We review a district court's denial of a motion for summary judgment sounding in qualified immunity *de novo*" and "draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quotation marks omitted).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Even if an officer violated a plaintiff's clearly established rights, he "will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Outlaw v. City of Hartford*,

---

[2] The Court thanks Plaintiffs' pro bono counsel for their service.

9

884 F.3d 351, 367 (2d Cir. 2018). These protections "balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality, instead emphasizing that clearly established law must be particularized to the facts of the case." *Francis v. Fiacco*, 942 F.3d 126, 146 (2d Cir. 2019) (cleaned up). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quotation marks omitted).

B.    Eighth Amendment Claims

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. Const., amend. VIII. To make out an Eighth Amendment claim, Plaintiffs must prove (1) an "objectively, sufficiently serious . . . denial of the minimal civilized measure of life's necessities" and (2) that prison officials had a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (cleaned up). Plaintiffs claim that the isolation and hygienic conditions in Q-Pod violated their Eighth Amendment rights. But Plaintiffs fail to identify cases clearly establishing that the alleged isolation and toilet restrictions amounted to a sufficiently serious deprivation.

10

1.    *Isolation*

Plaintiffs argue that their isolation in Q-Pod was cruel and unusual punishment. They say the district court erred in granting qualified immunity because "courts around the country have increasingly held that conditions of confinement that result in significant isolation—as plaintiffs experienced here—can satisfy the objective element of the Eighth Amendment." Appellants' Br. at 51. We disagree.

Q-Pod is not solitary confinement. Inmates are permitted two hours of recreation in groups of up to thirty inmates, as well as daily visitation. Q-Pod cells also house two inmates per cell, so Q-Pod is not designed for complete social isolation. Still, granting Plaintiffs' contention that some Q-Pod inmates had no cellmate, they faced up to 22 hours per day of social isolation. The physical and psychological consequences of long periods of social isolation may be severe, but the 22 hours per day of isolation alleged by Plaintiffs is only one hour more than the periods of isolation faced by inmates in the general prison population, and the Supreme Court has never held that 22 hours per day of isolation constitutes cruel and unusual punishment.

In *Hutto v. Finney*, the Court recognized that "[c]onfinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." 437 U.S. 678, 685 (1978). But that decision did not establish a bright-line rule. It instead upheld a district court's 30-day limit on punitive isolation in a "filthy, overcrowded cell" with "a diet of 'grue.'" *Id.* at 686-87. Those "isolation" cells were not solitary in the social sense; the issue was

overcrowding of the isolation cells. So *Hutto* does not clearly establish law that supports Plaintiffs' social-isolation claims.

This Court also has never held that such isolation is cruel and unusual. In *Reynolds v. Quiros*—on which Plaintiffs rely—we noted only that an inmate facing life in a solo cell for 21-22 hours a day "could arguably prevail on his claims alleging violations of the Eighth Amendment." 990 F.3d 286, 294 (2d Cir. 2021). But even there, we vacated the district court's grant of summary judgment for the inmate in light of disputed facts. *Id.* at 295. Dicta about disputed claims that "could arguably prevail" does not clearly establish that the isolation in Q-Pod violated the Eighth Amendment. And even if it did, *Reynolds* post-dates the challenged conduct and thus cannot undermine qualified immunity here. *See al-Kidd*, 563 U.S. at 741 ("A Government official's conduct violates clearly established law when, *at the time of the challenged conduct*, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." (emphasis added) (cleaned up)).

Nor do other circuits' decisions "clearly foreshadow[] a particular ruling on the issue" of social isolation. *Burns v. Martuscello*, 890 F.3d 77, 94 (2d Cir. 2018). Plaintiffs point to *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022), in which the Third Circuit held that an inmate's "almost complete isolation for seven months by officials who knew him to be seriously mentally ill" was a serious deprivation. *Id.* at 180. But *Clark* involved the solitary confinement of a seriously mentally ill inmate for all but three one-hour intervals per week. *Id.* at 173, 180. Plaintiffs' reliance on *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), fares

12

no better.  The Fourth Circuit held that "conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between 23 and 24 hours a day alone, in a small . . . cell" posed a substantial risk of serious harm.  *Id.* at 357 (quotation marks omitted).  Q-Pod, by contrast, is not designed for solitary confinement and provides more recreation time, as well as daily visitation.[3]

It is not clearly established that the level of social isolation in Q-Pod violated the Eighth Amendment, so we affirm the district court's grant of qualified immunity as to these claims.

### 2.  *Toilet Restrictions*

Plaintiffs argue that they endured unsanitary conditions because Q-Pod "had restrictions on flushing the toilet a certain number of times in a given period, causing the toilets to be turned off for two to three hours at a time."  Appellants' Br. at 6.  They argue that we have clearly established that such restrictions on toilet use violate the Eighth Amendment.  That is incorrect.

Neither the Supreme Court nor this Court has held that shutting off toilet flushes "for two to three hours at a time" violates the Eighth Amendment.  In *LaReau v. MacDougall*, 473 F.2d 974 (2d Cir. 1972), we recognized that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted."  *Id.* at 978.  But that case

---

[3] Even if these out-of-circuit cases were on point and clearly foreshadowed a ruling in favor of Plaintiffs on the isolation issue, they too would not undermine qualified immunity because they post-date Plaintiffs' alleged Q-Pod detentions.

involved a "Chinese toilet"—*i.e.*, a grate in the ground that collected waste in the open air until flushed by external control—which is far more "degrading" than a toilet with a flush timer. *Id.* at 977. Plaintiffs also point to *Willey v. Kirkpatrick*, 801 F.3d 51 (2d Cir. 2015), but that case involved a deprivation of running toilet water for a week or more. *Id.* at 66-67. Our caselaw does not clearly establish that a few hours without a flushing toilet violates the Eighth Amendment, so we affirm the grant of qualified immunity as to these claims.

C.    Due Process Claims

Plaintiffs argue that Defendants violated their due process right to be free from Q-Pod confinement. To make out a procedural due process claim under the Fourteenth Amendment, a prisoner must establish that (1) the state has created a liberty interest protected by the Due Process Clause and (2) limits on that liberty interest "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Even if Plaintiffs had a cognizable liberty interest in freedom from Q-Pod, the alleged durations and conditions of confinement would not violate their due process rights.

1.    *Liberty Interest*

Plaintiffs argue that they had a liberty interest in freedom from Q-Pod confinement. Plaintiffs "must establish . . . that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). They point to the DOC's Administrative Directives ("A.D.") as creating a liberty interest in freedom from unauthorized punishments. Under A.D. 9.5, an inmate

14

receives a "ticket" for certain infractions, which they can contest at a hearing. If guilt is established, the inmate serves time in the RHU. Plaintiffs do not challenge the disciplinary proceedings that initially landed them in the RHU. They instead challenge their post-RHU transfer to Q-Pod. So any liberty interest must arise from Plaintiffs' allegation that prison officials flouted regulations governing post-RHU confinement to use Q-Pod as an "illegal and off-the-books form of administrative segregation." Joint App'x at 38.

The relevant regulations appear in MacDougall-Walker's Inmate Handbook and the DOC's A.D. The Handbook provides that "[u]pon release from RHU and upon having been found guilty or having pled guilty to a charge(s) under the Code of Penal Discipline, inmates . . . will complete the remainder of their time on Unassigned Status in" Q-Pod. Joint App'x at 95-96. The Handbook states that inmates will stay in Q-Pod for 90 days for a Class A ticket or 60 days for a Class B ticket. A.D. 9.5 specifies the penalties that may be imposed for a disciplinary infraction. Defendants say that any confinement beyond these periods resulted from new violations, but they do not identify a regulation that provides for extending Q-Pod detention rather than reverting the inmate to the same disciplinary process that led to their placement in the RHU. Defendants also deny that conditions in Q-Pod amount to an unauthorized penalty. Because this issue is contested, we assume without deciding that the relevant regulations create a liberty interest in freedom from Q-Pod confinement.

15

Plaintiffs allege that they were confined in Q-Pod longer than the Handbook permits[4] and subject to penalties not set out in A.D. 9.5. Again assuming that the relevant regulations create a liberty interest, Plaintiffs may have alleged a deprivation of their right to be free from Q-Pod confinement.

2.    *Atypical and Significant Hardships*

Plaintiffs argue that they were "confined in Q-Pod for lengthy periods of time and under particularly harsh and restrictive prison conditions." Appellants' Br. at 42. For a deprivation of liberty to amount to "atypical and significant hardship," conditions must "work a major disruption" in their environment. *Sandin*, 515 U.S. at 486. Relevant factors "include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (cleaned up). "[E]specially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

Most of the challenged Q-Pod conditions do not significantly "differ from other routine prison conditions." *Palmer*, 364 F.3d at 64

---

[4] Rivera says he spent nine consecutive months in Q-Pod. Gladding says he was there for more than seven months consecutively and more than a year in total. Baltas alleges almost five consecutive months of confinement and over a year in total. Tarasco says that he was confined for "about three months and a few days on a Class A Ticket." Joint App'x at 118. And Rice says that he was confined for over three months.

(quotation marks omitted). First, Q-Pod inmates have only one less hour of recreation per day than other inmates in the general population. We have never held that such a deprivation of recreation and socialization constitutes an atypical and significant hardship,[5] even for the intermediate durations of Q-Pod detention alleged by Rivera and Gladding.[6] To the contrary, the Supreme Court in *Sandin* held that an inmate's segregation—with an average of 50 minutes each day out of the cell for 30 days—"did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest" because it "did not work a major disruption" compared to general-population inmates' eight to twelve out-of-cell hours. *Sandin*, 515 U.S. at 486 & n.8.

Second, Baltas and Tarasco claim that Q-Pod confinement deprived them of access to requested religious services, but their

---

[5] In *Palmer*, we affirmed a district court's denial of qualified immunity from an inmate's procedural due process claim for 77 days in a special housing unit without exercise, hygiene products, or visitation. 364 F.3d at 67. We explained that "it is possible that Palmer endured unusually harsh SHU conditions that constituted an 'atypical and significant deprivation' under *Sandin*." *Id.* But the mere possibility of success on a claim involving different conditions does not "place[] the statutory or constitutional question beyond debate" as needed to defeat qualified immunity under current doctrine. *al-Kidd*, 563 U.S. at 741.

[6] Between 101 and 305 days is an "intermediate duration" of confinement for which a district court must develop a "detailed record of conditions of confinement relative to ordinary prison conditions." *Palmer*, 364 F.3d at 65 (quotation marks omitted).

17

allegations do not rise to a cognizable hardship under *Sandin*.[7] Baltas's longest alleged stay in Q-Pod was almost five months. But there is no caselaw establishing that denial of religious services for five months imposes an atypical and significant hardship. In *Arce v. Walker*, 139 F.3d 329 (2d Cir. 1998), we rejected an inmate's procedural due process claim for eighteen days of segregation during which he was "entitled to only one hour of exercise per day and could not attend communal religious services." *Id.* at 336. Although we recognized that these conditions were more severe than those in the general prison population, we held that the deprivations "were not more onerous tha[n] those considered, and constitutionally sanctioned in *Sandin*." *Id.* To be sure, Baltas alleges a longer duration of religious deprivation in Q-Pod. But our decisions do not clearly establish a bright-line rule about when such deprivations are actionable under *Sandin*.

Plaintiffs' other alleged conditions also fail under *Sandin*. Plaintiffs complain that Q-Pod officials prevented toilet flushes "for two to three hours at a time." Appellants' Br. at 6. They further allege that they were deprived of job and training opportunities, even though they admit that the loss of those opportunities is based on an inmate's disciplinary record. And Plaintiffs allege inadequate medical care, but fail to identify any injuries or specific deprivations

---

[7] Seven other Plaintiffs allege that Q-Pod had "[s]egregated & restricted religious services (if any at all)." But they do not allege an atypical or significant hardship—or any hardship at all—because they do not claim to hold religious beliefs or to have been denied access to requested services for those beliefs. *See infra* Section II.D.

of care.  We have never held any of these conditions, whether alone or together, to be an atypical or significant hardship.

We cannot say that every reasonable officer would know that Q-Pod confinement, even for the longest periods alleged, violated Plaintiffs' procedural due process rights.  Plaintiffs identify no precedent clearly establishing that any of the alleged conditions constitutes atypical and significant hardship for the alleged durations.  We thus affirm the district court's grant of qualified immunity as to Plaintiffs' procedural due process claims.

D.    First Amendment Claims

Plaintiffs claim that Defendants violated their First Amendment right to free exercise of religion.  To make out a free exercise claim, a "prisoner must show at the threshold that the disputed conduct . . . burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014).[8]  But "[u]nder the First Amendment, the law is less generous to plaintiff prisoners; a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (quotation marks omitted).  Absent such a penological

---

[8] We recently "join[ed] those circuits that have held that an inmate does not need to establish a substantial burden in order to prevail on a free exercise claim under § 1983." *Kravitz v. Purcell*, 87 F.4th 111, 125 (2d Cir. 2023).  But that was not clearly established at the time of Plaintiffs' alleged Q-Pod confinements in 2015 and 2016. *See Wiggins v. Griffin*, 86 F.4th 987, 993 (2d Cir. 2023) ("We have not decided whether the substantial burden test survives *Employment Division v. Smith*.").

interest, "[i]t is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993).

Seven of the nine Plaintiffs—Goode, Pellot-Castellano, Rice, Davis, Rivera, Gladding, and Ortiz—fail to allege any burden on their sincerely held religious beliefs. They allege only that Q-Pod had "[s]egregated & restricted religious services (if any at all)." They do not even claim that they hold religious beliefs, much less that Defendants burdened their exercise of any such beliefs.[9] So we affirm the grant of qualified immunity on these Plaintiffs' claims.

The remaining two Plaintiffs—Baltas and Tarasco—claim that Defendants denied their requests to access congregate services for their Native American religion. Defendants declined to offer any penological justification for refusing Baltas and Tarasco access to these services.[10]

---

[9] Even if these Plaintiffs had alleged a burden on their sincerely held religious beliefs, their claims fail because they do not allege that Defendants knew or should have known that they had denied them access to their desired religious services. *See Wiggins*, 86 F.4th at 997 ("[M]ere negligence cannot support a First Amendment free exercise claim, . . . [but] deliberate indifference clearly suffices." (quotation marks omitted)).

[10] These practices involve open flames and require close supervision. *See Baltas v. Jones*, No. 3:21-CV-469, 2023 WL 8827880, at *20 (D. Conn. Dec. 21, 2023); *Hamilton v. Schriro*, 74 F.3d 1545, 1548 (8th Cir. 1996). But Defendants have disclaimed on appeal any penological justification based on those considerations. *See* Joint App'x at 146 ("Here, there has been no limitation or denial of the plaintiffs' rights to attend religious services, thus no explanation of a pen[o]logical rationale is necessary.").

20

Tarasco claims he was "continually being denied [his] Constitutional right to attend . . . Purification (sweat lodge)" and that he "was not allowed to attend [his] religious practices or purifications at all."[11]  Joint App'x at 118.  Tarasco's former cellmate attests that Tarasco spoke with a Q-Pod official and prison chaplain about his desire to access sweat-lodge services, so the deprivation is not the result of "[m]ere negligence."  *Wiggins*, 86 F.4th at 997.  Plaintiffs describe the sweat lodge as "a congregate Native American Religious Practice that occurs at MacDougall on a monthly basis, where the gen. pop inmates are permitted to attend."  Joint App'x at 330.  Sweat-lodge ceremonies may involve healers and participants sitting around a steam-producing fire in a domed lodge.  MacDougall-Walker is one of the few state prisons to have a sweat lodge.

"It is well established that prisoners have a constitutional right to participate in congregate religious services."  *Salahuddin*, 993 F.2d at 308.  In the context of MacDougall-Walker, where general-population Native American inmates hold congregate services in the prison's sweat lodge, no reasonable officer would think it lawful to deny Tarasco this form of congregation absent a legitimate penological purpose.  Accordingly, we reverse the grant of qualified immunity as to Tarasco's sweat-lodge claim.

The district court granted qualified immunity because Plaintiffs identified no caselaw that addresses the "free exercise rights of inmates to participate in sweat lodge."  Special App'x at 32.  Although we agree with the district court that there is no clearly established

---

[11] Baltas never alleged that he requested and was denied access to sweat-lodge services.

right to demand construction of a sweat lodge, *see Baltas v. Erfe*, No. 3:19-cv-1820, 2022 WL 4260672, at *12 (D. Conn. Sept. 15, 2022), there is a clearly established right to access congregate religious services where they already exist and are available. MacDougall-Walker had a sweat lodge for Native American services and Defendants advanced no penological justification for denying Tarasco access to religious congregation there, so Defendants are not entitled to qualified immunity.

Similarly, Baltas and Tarasco allege that prison officials denied their requests for "smudging." Smudging is a ritual involving burning organic matter such as tobacco. The record indicates that smudging is a congregate activity among MacDougall-Walker's general-population inmates. In response to Baltas's grievance about smudging, a prison official wrote that inmates in "Q-unit do not smudge with [the general] population. They are allowed to dry smudge in their cells until they move to another unit. The Native American Chapl[a]in does a service with the inmates in Q unit." Joint App'x at 78.

At MacDougall-Walker, where the general population is permitted to engage in congregate Native American smudging, no reasonable officer would think it lawful to deny this form of religious congregation absent penological justification.

The district court granted qualified immunity because Plaintiffs presented no authority on the First Amendment right to smudging. It is correct that there is no clearly established right to smudging or tobacco use for religious services in prison. *But see Williams v. Hansen*, 5 F.4th 1129, 1135 (10th Cir. 2021) (recognizing a right to tobacco for

22

religious services). But as with the sweat lodge, this analysis overlooks the congregate nature of Baltas's and Tarasco's desired smudging services and their availability to other Native American inmates at MacDougall-Walker. And because Defendants failed to offer any penological justification for denying Baltas and Tarasco congregate smudging with the general population, we reverse the grant of qualified immunity as to these denial-of-congregation claims.[12]

E.     State-Law Claims

Finally, the district court declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(c)(3). But when federal claims are reinstated, "§ 1367(c)(3) no longer provides a basis for declining to exercise jurisdiction over" related state-law claims. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 79 (2d Cir. 2003). In light of our decision to reinstate some of Baltas's and Tarasco's federal claims, we vacate the district court's dismissal of their state-law claims, but offer no view as to other reasons the district court might decide on remand to decline to exercise supplemental jurisdiction.

---

[12] Baltas's and Tarasco's general allegations about access to other "Native American Services" do not defeat Defendants' qualified immunity. Although there is a clearly established right to congregate services, we cannot say that every reasonable officer would know which Native American services implicate that right. At any rate, absent an allegation that Baltas or Tarasco requested access to particular services, they have no viable First Amendment claim against the Q-Pod officers based on the officers' mere ignorance of their desired course of religious practice. *See Wiggins*, 86 F.4th at 997-98.

## III. CONCLUSION

We affirm the district court's judgment and order granting Defendants qualified immunity from Plaintiffs' Eighth Amendment and procedural due process claims, as well as the Free Exercise claims of seven of the nine Plaintiffs. But we reverse as to Baltas's and Tarasco's free exercise claims because they allege denial of their clearly established right to participate in congregate religious services absent a legitimate penological justification. Accordingly, the judgment and order of the district court are affirmed in part and reversed in part, and the case is remanded with instructions to deny Defendants' motion for summary judgment on qualified-immunity grounds as to Baltas's and Tarasco's denial-of-congregation claims and to reinstate their state-law claims.